## COHEN *v.* HURLEY.

No. 84.   Argued December 14–15, 1960.—Decided April 24, 1961.

*Theodore Kiendl* argued the cause and filed a brief for petitioner.

*Denis M. Hurley,* respondent, argued the cause *pro se.* With him on the brief were *Michael A. Castaldi, Michael Caputo* and *James F. Niehoff.*

Briefs of *amici curiae,* urging affirmance, were filed by *Henry Weiner* for the Co-ordinating Committee on Discipline of the Association of the Bar of the City of New York et al., and by *Robert P. Hobson* for the Standing Committee on Professional Grievances of the American Bar Association.

Briefs of *amici curiae,* urging reversal, were filed by *Leonard B. Boudin* for the New York State Association of Plaintiffs' Trial Lawyers; *Emanuel Redfield* for the New York Civil Liberties Union; and *David Scribner* and *Herman B. Gerringer* for the National Lawyers Guild.

MR. JUSTICE HARLAN delivered the opinion of the Court.

We are called upon to decide whether the State of New York may, consistently with the Fourteenth Amendment, disbar an attorney who, relying on his state privilege against self-incrimination, has refused to answer material questions of a duly authorized investigating authority relating to alleged professional misconduct.[1]

---

[1] N. Y. Const., Art. I, § 6. While petitioner, at his appearance before the investigating authority, also claimed a federal privilege not to testify, in his later response to the petition initiating disciplinary proceedings he relied solely upon "the privilege against self-incrimination guaranteed to all persons, lawyers or laymen alike, under Article I Section 6 of the New York State Constitution." It is of course settled that a Fifth Amendment privilege was not available to petitioner in the present case. See, *e. g., Knapp* v. *Schweitzer,* 357 U. S. 371; *Lerner* v. *Casey,* 357 U. S. 468, 478. Nor do we understand it to be contended that the Fourteenth Amendment automatically precluded the State from exacting petitioner's testimony and attaching consequences to his refusal to respond. Cf. *Adamson* v. *California,* 332 U. S. 46, 54; *Palko* v. *Connecticut,* 302 U. S. 319, 323–324; *Twining* v. *New Jersey,* 211 U. S. 78, 110–114. We take the petitioner's position and the remittitur of the Court of Appeals as presenting under the Fourteenth Amendment only a broad claim of fundamental unfairness.

The issue arises in the context of the so-called Brooklyn "ambulance chasing" Judicial Inquiry which this Court had before it in *Anonymous* v. *Baker*, 360 U. S. 287. The origins, authority, and nature of the Inquiry have already been sufficiently described in our opinion in that case. There need only be added here that the purpose of the Inquiry, as reflected in the establishing order of the Appellate Division of the Supreme Court of the State of New York, Second Department, was twofold: "to expose all the evil practices [involved in the improper solicitation and handling of contingent-retainers in personal injury cases] with a view to enabling this court to adopt appropriate measures to eliminate them and to discipline those attorneys found to have engaged in them." 9 App. Div. 2d 436, 437, 195 N. Y. S. 2d 990, 993.

For some years the Second Department has had a court rule "which requires that an attorney who makes contingent-fee agreements for his services in personal injury, wrongful death, property damage, and certain other kinds of cases, must file such agreements with the [Appellate Division] and, if he enters into five or more such agreements in any year, must give to the court in writing certain particulars as to how he came to be retained" (called "Statements of Retainer"). 7 N. Y. 2d 488, 493, 166 N. E. 2d 672, 674; see Rule 3 of the Special Rules Regulating the Conduct of Attorneys and Counselors at Law in the Second Judicial Department, Clevenger's Practice Manual, p. 21–19 (1959). Principally as a result of the large number of Statements of Retainer filed by him during recent years, petitioner was called to testify and produce records before the Justice in charge of the Inquiry.[2] Relying on his con-

---

[2] The following quotation from the respondent's brief accurately reflects the record:

"During the period 1954 to 1958, inclusive, pursuant to the provisions of said Rule, petitioner, a specialist in negligence cases, filed 228 statements as to retainer in his own name. In addition, 76 such

cededly available state privilege against self-incrimination, petitioner refused to produce the records called for and to answer some sixty other questions. The subject matter of such questions was summarized by the New York Court of Appeals in its opinion in this case (7 N. Y. 2d 488, 494, 166 N. E. 2d 672, 674–675), as follows:

> ". . . Those unanswered questions related to the identity of his law office partners, associates and employees, to his possession of the records of the cases described in his statements of retainer, to any destruction of such records, to his bank accounts, to his paying police officers or others for referring claimants to him, to his paying insurance company employees for referring cases to him, and to his promising to pay to any 'lay person' 10% of recoveries or settlements. He was asked—and refused to answer—as to whether he had made or agreed to make such payments to any of several named persons, as to whether he had hired or paid nonlawyers to arrange settlements of his cases with insurance companies and as to whether his partner or associate Rothenberg had been indicted for and had pleaded guilty to violations of sections 270–a and 270–d of the Penal Law which forbid the solicitation of legal business or the employment by lawyers of such solicitors. . . ."

After petitioner had refused to answer these questions, counsel for the Inquiry warned him that "serious consequences," in the form of an exercise of the Appellate Division's disciplinary power over attorneys practicing before

statements were filed in the firm name of Cohen & Rothenberg, thus indicating that petitioner and his law firm had been retained on a contingent basis in a total of 304 negligence cases in five years (R. 33–35). The inquiry therefore deemed it advisable to call petitioner as one of its witnesses."

it,[3] might flow from his refusal to respond, even though that refusal was based on a claim of privilege. As the basis for his warning counsel referred to various provisions of the Canons of Professional Ethics[4] and of the New York Penal Law.[5] Petitioner was then given a further opportunity to respond to the unanswered questions, but he declined, preferring to rely upon his claim of privilege.

Thereafter the Justice in charge of the Inquiry recommended to the Appellate Division that petitioner be disciplined. The Appellate Division ordered respondent Hurley to file a petition for disciplinary action. The ensuing petition sought petitioner's disbarment, alleging as grounds therefor:

> "The refusal of . . . Albert Martin Cohen, to produce the records [called for by the Inquiry], and his refusal to answer the questions [summarized above], are in disregard and in violation of the inherent duty and obligation of respondent as a member of the legal profession in that, among other things, such refusals are contrary to the standards of candor and frankness that are required and expected of a lawyer

---

[3] Section 90 of the New York Judiciary Law.

[4] ". . . Canon 22 . . . requiring lawyers to be candid and frank when before the court, Canons 28 and 29 forbidding the payment of awards to persons bringing in legal business and requiring lawyers knowing of such practices to inform the court thereof, Canon 34 outlawing division of fees except with other lawyers . . . ." 7 N. Y. 2d 488, 494, 166 N. E. 2d 672, 675. Canons 29 and 34 of the New York Canons of Professional Ethics are found in McKinney N. Y. Laws, Judiciary Law, pp. 774–775. Canons 22 and 28 are found in the 1959 "pocket part," at pp. 210–211. They are similar in all respects to the correspondingly numbered Canons of Professional Ethics of the American Bar Association.

[5] N. Y. Pen. Law §§ 270–a, 270–c, 270–d, 276, "all relating to soliciting and fee splitting." 7 N. Y. 2d 488, 494, 166 N. E. 2d 672, 675.

to the Court; such refusals are in defiance of and flaunt [*sic*] the authority of the Court to inquire into and elicit information within respondent's knowledge relating to his conduct and practices as a lawyer; by his refusal to answer the aforesaid questions the respondent hindered and impeded the Judicial Inquiry that was ordered by this Court; by his refusals respondent withheld vital information bearing upon his conduct, character, fitness, integrity, trust and reliability as a member of the legal profession. . . ."

The Appellate Division ordered petitioner disbarred, saying (9 App. Div. 2d, at 448–449, 195 N. Y. S. 2d, at 1003):

"To avoid any possible doubt as to our position, we state again that the basis for any disciplinary action by this court is, not the fact that respondent has invoked his constitutional privilege against self incrimination, but rather the fact that he has deliberately refused to co-operate with the court in its efforts to expose unethical practices and in its efforts to determine incidentally whether he had committed any acts of professional misconduct which destroyed the character and fitness required of him as a condition to his retention of the privilege of remaining a member of the Bar."

The New York Court of Appeals affirmed, Judge Fuld dissenting.[6]   7 N. Y. 2d 488, 166 N. E. 2d 672.   We granted certiorari because the case presented still another variant of the issues arising in the *Konigsberg* and *Anastaplo* cases, *ante,* pp. 36, 82.

Starting from the undeniably correct premise that a State may not arbitrarily refuse a person permission to

---

[6] Judge Fuld dissented on state constitutional grounds, reaching no federal questions.

practice law, *Konigsberg* v. *State Bar of California,* 353 U. S. 252; *Schware* v. *Board of Bar Examiners,* 353 U. S. 232, petitioner's claim that New York's disbarment of him was capricious rests essentially on two propositions: (1) that the Fourteenth Amendment forbade the State from making his refusal to answer the Inquiry's questions a *per se* ground for disbarment; (2) that in any event such a ground is not permissible when refusal to answer rests on a *bona fide* claim of a privilege against self-incrimination.

## I.

The first contention must be rejected largely in light of our today's opinions in the *Konigsberg* and *Anastaplo* cases, *ante,* pp. 36, 82. The fact that such refusal was here made a ground for disbarment, rather than for denial of admission to the bar, as in *Konigsberg* and *Anastaplo,* is not of constitutional moment. And there is no claim here either that the unanswered questions were not material or that petitioner was not duly warned of the consequences of his refusal to answer. By the same token those cases also dispose of petitioner's basically similar contention that the State could proceed against him only by way of independent evidence of wrongdoing on his part.

We do not think it can be seriously contended that New York's judicial inquiry was so devoid of rational justification that the mere act of compelling even unprivileged testimony was a deprivation of petitioner's liberty without due process. History and policy combine to establish the presence of a substantial state interest in conducting an investigation of this kind. That interest is nothing less than the exertion of disciplinary powers which English and American courts (the former primarily through the Inns of Court) have for centuries possessed over members of the bar, incident to their broader responsibility for

keeping the administration of justice and the standards of professional conduct unsullied. Not only is the practice of such judicial investigations long-established, but the subject matter of the present investigation does not lack a rational basis. It is no less true than trite that lawyers must operate in a three-fold capacity, as self-employed businessmen as it were, as trusted agents of their clients, and as assistants to the court in search of a just solution to disputes. It is certainly not beyond the realm of permissible state concerns to conclude that too much attention to the business of getting clients may be incompatible with a sufficient devotion to duties which a lawyer owes to the court, or that the "payment of awards to persons bringing in legal business" is inconsistent with the personally disinterested position a lawyer should maintain.

Finally, it cannot by any stretch be considered that New York acted arbitrarily or irrationally in applying the disciplinary sanction of disbarment to the petitioner. What Mr. Justice Cardozo (then Chief Judge of the New York Court of Appeals) said in the *Karlin* case is enough to put an end to that contention:

> "If a barrister was suspected of misconduct, the benchers of his inn might inquire of his behavior. We can hardly doubt that refusal to answer would have been followed by expulsion. There was thus little occasion for controversies as to discipline to be brought before the judges unless the benchers failed in the performance of their duties. In case they did fail, a supervisory power was ever in reserve. The inns . . . were subject . . . to visitation by the judges . . . . Short shrift would there have been for the barrister who refused to make answer as to his professional behavior in defiance of the visitors." 248 N. Y., at 472–473, 162 N. E., at 490.

If more than long-lived practice is thought necessary to justify such a sanction, it is to be found in the fact that the denial of continued access to a position that can be misused is permissible to assure that the position may not be held without observance of the obligations lawfully imposed upon it. Revocation of a license for failure to fulfill similar obligations of a licensee is the very sanction which the Federal Government has adopted in a number of situations. See 12 U. S. C. § 481, 47 U. S. C. §§ 308 (b), 312 (a)(4).

## II.

A different constitutional conclusion does not result from the fact that petitioner's refusal was based on a good-faith assertion of his state privilege against self-incrimination. Because, from a federal standpoint, there can be no doubt that a State has great leeway in defining the reach of its own privilege against self-incrimination, we regard the scope of federal review here as being limited to the question whether arbitrary or discriminatory state action can be found in the consequences New York has attached to the exercise of the privilege in this instance.

Basic to consideration of this aspect of petitioner's case is the fact that the State's disbarment order was predicated not upon any unfavorable inference which it drew from petitioner's assertion of the privilege, cf. *Slochower* v. *Board of Higher Education,* 350 U. S. 551, 557–558; *Grunewald* v. *United States,* 353 U. S. 391, 421, nor upon any purpose to penalize him for its exercise, but solely upon his refusal to discharge obligations which, as a lawyer, he owed to the court. The Court of Appeals stated:

> "Of course, [petitioner] had the right to assert the privilege and to withhold the criminating answers. That right was his as it would be the right of any citizen and it was not denied to him. He could not

be forced to waive his immunity . . . . But the question still remained as to whether he had broken the 'condition' on which depended the 'privilege' of membership in the Bar . . . . 'Whenever the condition is broken, the privilege is lost' [citing *Matter of Rouss,* 221 N. Y. 81, 84–85, 116 N. E. 782, 783, Cardozo, J.]. Appellant as a citizen could not be denied any of the common rights of citizens. But he stood before the inquiry and before the Appellate Division in another quite different capacity, also. As a lawyer he was 'an officer of the court, and, like the court itself, an instrument . . . of justice' [citing *People ex rel. Karlin* v. *Culkin,* 248 N. Y. 465, 470–471, 162 N. E. 487, 489, Cardozo, J.], with the inevitable consequences that the court which was charged with control and discipline of its officers had its own right to demand his full, honest and loyal co-operation in its investigations and to strike his name from the rolls if he refused to co-operate. Such 'co-operation' is a 'phrase without reality' as Chief Judge Cardozo wrote in *People ex rel. Karlin* v. *Culkin (supra,* p. 471) if a lawyer after refusing to answer pertinent questions about his professional conduct can retain his status and privileges as an officer of the court." 7 N. Y. 2d, at 495, 166 N. E. 2d, at 675.

We do not think that it can be seriously contended that the unavailability of the state privilege in judicial inquiries of this type amounts to a distinction from criminal prosecutions so irrational as to suggest either a denial of due process or a purposeful discrimination of the kind which violates the Equal Protection Clause of the Fourteenth Amendment. A State may rationally conclude that the consequence of disbarment is less drastic than that of a prison term for contempt, albeit arguments to the contrary can be made as well. It may also rationally

conclude that procedures resulting in greater preventive certainty are warranted when what is involved is the right to continue to occupy a position affording special opportunities for deleterious conduct—opportunities, indeed, created by the State's original certification of the petitioner's merit. In this regard all that New York has in effect held is that petitioner, by resort to a privilege against self-incrimination, can no more claim a right not to be disbarred for his refusal to answer with respect to matters within the competence of the Court's supervisory powers over members of the bar, than could a trustee claim a right not to be removed from office for failure to render accounts which might incriminate him. Finally, where illegal or shady practices on the part of some lawyers are suspected, New York could rationally conclude that the profession itself need not be subjected to the disrespect which would result from the publicity, delay, and possible ineffectiveness in their exposure and eradication that might follow could miscreants only be dealt with through ordinary investigatory and prosecutorial processes. "If the house is to be cleaned, it is for those who occupy and govern it, rather than for strangers, to do the noisome work." *People ex rel. Karlin* v. *Culkin,* 248 N. Y. 465, 480, 162 N. E. 487, 493 (Cardozo, J.).

These bases for affording a procedure in such judicial inquiries different from that in criminal prosecutions are more than enough to make wholly untenable a contention that there has here been a denial either of due process or of equal protection.

Although what has already been said disposes of this case, we take note, in conclusion, of two further considerations. First, it is suggested that the Fourteenth Amendment gave petitioner a *federal* constitutional right not to be required to incriminate himself in the state proceedings (although, apart from his claim of funda-

mental unfairness, the petitioner himself does not so contend, Note 1, *supra*). That proposition, however, was explicitly rejected by this Court, upon the fullest consideration, more than fifty years ago, *Twining* v. *New Jersey,* 211 U. S. 78,[7] and such has been the position of the Court ever since.[8] See *Snyder* v. *Massachusetts,* 291

---

[7] "Even if the historical meaning of due process of law and the decisions of this court did not exclude the privilege from it, it would be going far to rate it as an immutable principle of justice which is the inalienable possession of every citizen of a free government. Salutary as the principle may seem to the great majority, it cannot be ranked with the right to hearing before condemnation, the immunity from arbitrary power not acting by general laws, and the inviolability of private property. The wisdom of the exemption has never been universally assented to since the days of Bentham; many doubt it to-day, and it is best defended not as an unchangeable principle of universal justice but as a law proved by experience to be expedient. See Wigmore, § 2251. It has no place in the jurisprudence of civilized and free countries outside the domain of the common law, and it is nowhere observed among our own people in the search for truth outside the administration of the law. It should, must and will be rigidly observed where it is secured by specific constitutional safeguards, but there is nothing in it which gives it a sanctity above and before constitutions themselves. Much might be said in favor of the view that the privilege was guaranteed against state impairment as a privilege and immunity of National citizenship, but, as has been shown, the decisions of this court have foreclosed that view. There seems to be no reason whatever, however, for straining the meaning of due process of law to include this privilege within it, because, perhaps, we may think it of great value. The States had guarded the privilege to the satisfaction of their own people up to the adoption of the Fourteenth Amendment. No reason is perceived why they cannot continue to do so. The power of their people ought not to be fettered, their sense of responsibility lessened, and their capacity for sober and restrained self-government weakened by forced construction of the Federal Constitution. . . ." 211 U. S., at 113–114.

[8] Hence, if any "constitutional privilege against self-incrimination" has here been made a " 'phrase without reality' " it can only have been a state privilege which this Court does not have jurisdiction to protect.

U. S. 97; [9] *Brown* v. *Mississippi,* 297 U. S. 278, 285; *Palko* v. *Connecticut,* 302 U. S. 319, 323–324; *Adamson* v. *California,* 332 U. S. 46; [10] *Knapp* v. *Schweitzer,* 357 U. S. 371, 374. This is not to say, of course, that States have free rein either in the choice of means of forcing incriminatory testimony, or in the drawing of inferences from a refusal to testify on grounds of possible self-incrimination, no matter how objectionable·or irrational. But these decisions do establish, at the very least, that to make out a violation of the Fourteenth Amendment, something substantially more must be shown than that the state procedures involved have a tendency to discourage the withholding of self-incriminatory testimony.

It is, however, suggested that such additional factors are to be found in New York's assertion of a power to grant a state privilege against self-incrimination without including within its sweep protection from disbarment of a lawyer who asserts this privilege during a judicial inquiry into his professional conduct. It is said that this gives rise to a pernicious doctrine whereby lawyers "may be separated into a special group upon which special burdens can be imposed even though such burdens are not and cannot be placed upon other groups."

This argument wholly misconceives the issue and what the Court has held respecting it. The issue is not, of course, *whether* lawyers are entitled to due process of law in matters of this kind, but, rather, *what* process is constitutionally due them in such circumstances. We do

---

[9] "The privilege against self-incrimination may be withdrawn and the accused put upon the stand as a witness for the state." 291 U. S., at 105.

[10] "California follows Anglo-American legal tradition in excusing defendants in criminal prosecutions from compulsory testimony. . . . That is a matter of legal policy and not because of the requirements of due process under the Fourteenth Amendment." 332 U. S., at 54–55.

not hold that lawyers, because of their special status in society, can *therefore* be deprived of constitutional rights assured to others, but only, as in all cases of this kind, that what procedures are fair, what state process is constitutionally due, what distinctions are consistent with the right to equal protection, all depend upon the particular situation presented, and that history is surely relevant to these inquiries.[11]   State banks may be subjected to periodic examinations that would violate the rights of some other kinds of business against unreasonable search and seizure.   Compare 12 U. S. C. § 481 with *Boyd* v. *United States,* 116 U. S. 616.   A state contractor can be deprived of even the rudiments of a hearing on the issue of whether the state executive department is contracting in accordance with applicable state law.   Cf. *Perkins* v. *Lukens Steel Co.,* 310 U. S. 113.   The "right" to judicial review of agency determinations can be taken away from railroad employees in one situation but

---

[11] Of course it is not alone the early beginning of the practice of judicial inquiry into attorney practices which is significant upon the reasonableness of what transpired here.   Rather it is the long life of that mode of procedure which bears upon that issue, in much the same way that a strong consensus of views in the States is relevant to a finding of fundamental unfairness.   What is significant is that the *practice* we are now concerned with has survived the centuries which have seen the fall of all those iniquitous *standards* of which we are reminded, and which, incidentally, would be equally unconstitutional today if applied after a full criminal-type investigation and trial.   While recognizing that the test was not exclusive, this Court stated many years ago:

"First. What is due process of law may be ascertained by an examination of those settled usages and modes of proceedings existing in the common and statute law of England before the emigration of our ancestors, and shown not to have been unsuited to their civil and political condition by having been acted on by them after the settlement of this country.   This test was adopted by the court, speaking through Mr. Justice Curtis, in *Murray* v. *Hoboken Land Co.,* 18 How. 272, 280 . . . ."   *Twining* v. *New Jersey, supra,* at 100.

guaranteed to professional employees in other situations. Compare *Switchmen's Union of North America* v. *National Mediation Board,* 320 U. S. 297, with *Leedom* v. *Kyne,* 358 U. S. 184. A state employee need no longer be entrusted with government property if he refuses to explain what has become of property with which he is charged though his refusal may be protected against a contempt sanction by a state or federal privilege against self-incrimination. Cf. *Lerner* v. *Casey,* 357 U. S. 468.

Clearly enough, factual distinctions are the determinative consideration upon the question of what process is due in each of these cases. Otherwise making state procedures vary solely on the basis of the given occupation would indeed be nothing less than a denial of equal protection to bankers, contractors, railroad employees, and government employees. On the basis of the factual distinctions that we have mentioned above, we consider that a State can constitutionally afford a different procedure— the present procedure—in these judicial investigations from that in criminal prosecutions.

Petitioner's disbarment is not constitutionally infirm, and the Court of Appeals' order must be

*Affirmed.*

MR. JUSTICE BLACK, with whom THE CHIEF JUSTICE and MR. JUSTICE DOUGLAS concur, dissenting.

We are once again called upon to consider the constitutionality of penalties imposed upon lawyers who refuse to testify before a secret inquiry being conducted by the State of New York into suspected unethical practices among members of the legal profession in and around New York City. In *Anonymous* v. *Baker,*[1] a majority

---

[1] 360 U. S. 287. The majority there held that witnesses before the inquiry could constitutionally be deprived of a public hearing and the assistance of counsel. But cf. *Chambers* v. *Florida,* 309 U. S. 227, 237: "The determination to preserve an accused's right to pro-

of this Court upheld the power of New York to conduct such a secret inquiry. Here, the majority upholds the disbarment of petitioner, a New York lawyer for thirty-nine years, solely because, in reliance upon an assertion of his constitutional privilege against self-incrimination, he refused to testify before that inquiry. The theory upon which this order of disbarment was upheld by the New York Court of Appeals—a theory which the majority here embraces—is that although lawyers, as citizens, have a constitutional right not to incriminate themselves, they also have a special duty, as lawyers, to cooperate with the courts and that this "duty of co-operation" would become a " 'phrase without reality' . . . if a lawyer after refusing to answer pertinent questions about his professional conduct can retain his status and privileges as an officer of the court." [2] In my judgment, however, the majority is here approving a practice that makes the constitutional privilege against self-incrimination the "phrase without reality." [3]

---

cedural due process sprang in large part from knowledge of the historical truth that the rights and liberties of people accused of crime could not be safely entrusted to secret inquisitorial processes."

[2] *Matter of Cohen,* 7 N. Y. 2d 488, 495, 166 N. E. 2d 672, 675.

[3] In my judgment, petitioner's reliance upon his federal privilege against self-incrimination under the Fifth and Fourteenth Amendments is sufficiently shown by this whole record to require the consideration of that question by this Court. As the majority points out, petitioner expressly asserted that privilege before the court conducting the inquiry. Since that time it is true that he has not always spelled out with meticulous specificity this self-incrimination claim under the Fifth and Fourteenth Amendments, but he has consistently and repeatedly urged that his disbarment violates the Fourteenth Amendment. And the record shows throughout that the whole controversy has hinged around the question of the power of the State, under both the State and the Federal Constitutions, to force him to answer the questions he had been asked at the inquiry. Under these circumstances, I cannot allow to pass unnoticed the violation which I think has occurred with respect to petitioner's rights under the Fifth

This almost magical obliteration of the privilege against self-incrimination represents a radical departure from the previously established practice in the State of New York. For, as pointed out in the dissent of Judge Fuld, the New York Court of Appeals had earlier condemned an attempt to introduce precisely the policy it here accepted, saying: " 'The constitutional privilege [not to incriminate one's self] is a fundamental right and a measure of duty; its exercise cannot be a breach of duty to the court.' It follows that . . . the present disciplinary proceeding instituted against the appellant, wherein the single offense charged is his refusal to yield a constitutional privilege, is unwarrantable." [4]

In departing from its prior policy of fully protecting the privilege against compelled self-incrimination guaranteed by both the State and the Federal Constitutions, the New York court relied heavily on several of this Court's recent cases. [5] Those cases, I regret to say, do provide some support for New York's partial nullification of the constitutional privilege against self-incrimination. For those cases are a product of the recently emphasized constitutional philosophy under which no constitutional right is safe from being "balanced" out of existence whenever a majority of this Court thinks that the interests of the State "weigh more" than the particular constitutional guarantee involved. [6] The product of the "bal-

---

Amendment. Cf. *Boynton* v. *Virginia*, 364 U. S. 454, 457. While the Court seems to intimate an opposite view, its opinion appears to me actually to pass upon this federal contention.

[4] *Matter of Grae*, 282 N. Y. 428, 435, 26 N. E. 2d 963, 967.

[5] 7 N. Y. 2d, at 496, 166 N. E. 2d, at 676. The cases relied upon were: *Lerner* v. *Casey*, 357 U. S. 468; *Beilan* v. *Board of Education*, 357 U. S. 399; *Nelson* v. *County of Los Angeles*, 362 U. S. 1.

[6] The majority has not even bothered expressly to "strike a balance" in these cases apparently on the theory that the value of the privilege against self-incrimination is so small that it can be "outweighed" by

ancing" here is the conclusion that the State's interest in disbarring any lawyer suspected of "ambulance chasing" outweighs the value of those provisions of our Bill of Rights and the New York Constitution commanding government not to make people testify against themselves. This is a very dubious conclusion, at least to one like me who believes that our Bill of Rights guarantees are essential to individual liberty and that they state their own values leaving no room for courts to "weigh" them out of the Constitution.[7] The First Amendment freedoms have already suffered a tremendous shrinkage from "balancing," [8] and here the Fifth Amendment once again suffers from the same process.[9] I agree with MR. JUSTICE DOUGLAS that the order here under review is in direct conflict with the mandate of the Fifth Amendment as made controlling upon the States by the Fourteenth Amendment.[10]

---

*any* countervailing governmental interest. See, *e. g.*, *Nelson* v. *County of Los Angeles, supra,* at 7–8: "Nor do we think that this discharge is vitiated by any deterrent effect that California's law might have had on Globe's exercise of his federal claim of privilege. The State may nevertheless legitimately predicate discharge on refusal to give information touching on the field of security."

[7] My views of this "balancing" process have been set out at length in the companion cases, *Konigsberg* v. *State Bar of California,* decided today, *ante,* p. 56, at 62–71, 75, and *In re Anastaplo,* decided today, *ante,* p. 97, at 109–113. See also the opinions cited at n. 10 in my dissenting opinion in *Konigsberg.*

[8] See, *e. g.*, *Wilkinson* v. *United States,* 365 U. S. 399; *Braden* v. *United States,* 365 U. S. 431; *Times Film Corp.* v. *City of Chicago,* 365 U. S. 43; *Uphaus* v. *Wyman,* 364 U. S. 388; *Barenblatt* v. *United States,* 360 U. S. 109; *Uphaus* v. *Wyman,* 360 U. S. 72.

[9] It is true that some inroads have already been made into the Fifth Amendment, for both *Lerner* v. *Casey, supra,* and *Nelson* v. *County of Los Angeles, supra,* rested partly upon a willingness of a majority of this Court to "balance" away the full protection of that Amendment.

[10] This conclusion is reached primarily on the basis of agreement with the dissenting opinion of Mr. Justice Harlan in *Twining* v. *New*

In a less important area, I would be content to rest my dissent upon the single ground that a State may not penalize any person for invoking his constitutional privilege against self-incrimination. But, as I see this case, it involves other constitutional problems that go far beyond the privilege against self-incrimination—problems that involve dangers which, though as yet largely peculiar to the members of the legal profession, are so important that they need to be discussed. And, as I understand the majority's opinion, it disposes of those problems on a ground that, from the standpoint of the legal profession, is the most far-reaching possible—that lawyers have fewer constitutional rights than others. It thus places the stamp of approval upon a doctrine that, if permitted to grow, as doctrines have a habit of doing, can go far toward destroying the independence of the legal profession and thus toward rendering that profession largely incapable of performing the very kinds of services for the public that most justify its existence.

The unlimited reach of the doctrine being promulgated can best be shown by analysis of the issue before us as that issue was posed by the court below. In concluding that petitioner should be disbarred for reliance upon the privilege against self-incrimination, the New York Court of Appeals expressly recognized the right of every citizen, under New York law, to refuse to give self-incriminating testimony. "That right," the court said, "was his [petitioner's] as it would be the right of any citizen . . . ." But, the court reasoned, petitioner was more

---

*Jersey,* 211 U. S. 78, 114–127. But even if that case were rightly decided, it would not provide support for the decision here. For the issue with regard to the privilege against self-incrimination here is quite different from the issue posed in the *Twining* case. In that case the only question before the Court was whether comment upon a defendant's failure to take the stand in his own defense was constitutionally permissible.

than an ordinary citizen. "[H]e stood before the inquiry and before the Appellate Division in another quite different capacity, also." [11] The capacity referred to was petitioner's capacity as a lawyer. In that "capacity," the court concluded, petitioner could not properly avail himself of his rights as a citizen. Thus it is clear that the theory adopted by the court below and reaffirmed by the majority here is that lawyers may be separated into a special group upon which special burdens can be imposed even though such burdens are not and cannot be placed upon other groups. Lawyers are thus to have their legal rights determined by something less than the "law of the land" as it is accorded to other people.

In my judgment, the theory so casually but enthusiastically adopted by the majority constitutes nothing less than a denial to lawyers of both due process and equal protection of the laws as guaranteed by the Fourteenth Amendment. For I have always believed that those guarantees, taken together, mean at least as much as Daniel Webster told this Court was meant by due process of law, or the "law of the land," in his famous argument in the *Dartmouth College* case: "By the law of the land is most clearly intended the general law . . . . The meaning is, that every citizen shall hold his life, liberty, property, and immunities, under the protection of the general rules which govern society." [12] I think it is clear that the opin-

---

[11] 7 N. Y. 2d, at 495, 166 N. E. 2d, at 675.

[12] *Dartmouth College* v. *Woodward*, 4 Wheat. 518, 581. See also *Vanzant* v. *Waddel*, 2 Yerger 260, in which Judge Catron, later Mr. Justice Catron, speaking for the Supreme Court of Tennessee, observed: "The right to life, liberty and property, of every individual, must stand or fall by the same rule or law that governs every other member of the body politic, or 'LAND,' under similar circumstances; and every partial or private law, which directly proposes to destroy or affect individual rights, or does the same thing by affording remedies leading to similar consequences, is unconstitutional and void." *Id.*, at 270. The views expressed by Webster and Judge Catron

ion of the majority in this case says unequivocally that lawyers may not avail themselves of "the general rules which govern society."

The majority recognizes, as indeed it must, that New York is depriving lawyers, because they are lawyers, of the full benefit of a constitutional privilege available to other people. But, instead of reaching the natural and, I think, obvious conclusion that such a singling out of one particular group [13] for special disabilities with regard to the basic privileges of individuals is in direct conflict with the Fourteenth Amendment,[14] it chooses to defend this patent discrimination against lawyers on the theory that there are no protections guaranteed to every man who, in the words of Magna Charta, is being "anywise destroyed" by the Government. The "law of the land" is therefore, in the view of the majority, an accordion-like protection that can be withdrawn from any person or group of persons whenever the Government might prefer "procedures resulting in greater preventive certainty" if it can show some "reasonable" basis for that

---

go back at least as far as 1215 and Magna Charta, in which it was provided: "No free man shall be taken or imprisoned, or disseised, or outlawed, or exiled, or anywise destroyed; nor shall we go upon him nor send upon him, but by the lawful judgment of his peers or by the law of the land."

[13] I recognize, of course, that New York also singles out other groups for special treatment with regard to certain constitutional privileges. See *Barsky* v. *Board of Regents,* 347 U. S. 442. That practice, which I regard as also clearly unconstitutional (see my dissenting opinion in that case, *id.,* at 456–467), does not affect the argument here. For discrimination against one group cannot be justified on the ground that it is also practiced against another.

[14] Cf. *Griffin* v. *Illinois,* 351 U. S. 12. In that case, we said: "In this tradition [the tradition of Magna Charta], our own constitutional guaranties of due process and equal protection both call for procedures in criminal trials which allow no invidious discriminations between persons and different groups of persons." *Id.,* at 17.

preference. The majority then proceeds to find such a "reasonable" basis on two grounds: first, that lawyers occupy a high position in our society "affording special opportunities for deleterious conduct" and can, by virtue of that position, be compelled to forego rights that are accorded to other groups; and, secondly, that the powers here exercised over petitioner by the courts of New York are no different than those exercised over lawyers by the courts of England several hundred years ago. In my judgment, neither of these grounds provides the slightest justification for the refusal of the State of New York to allow lawyers to avail themselves of "the general rules which govern society."

I heartily agree with the view expressed by the majority that lawyers occupy an important position in our society, for I recognize that they have a great deal to do with the administration, the enforcement, the interpretation, and frequently even with the making of the Constitution and the other laws that govern us. But I do not agree with the majority that the importance of their position in any way justifies a discrimination against them with regard to their basic rights as individuals. Quite the contrary, I would think that the important role that lawyers are called upon to play in our society would make it all the more imperative that they not be discriminated against with regard to the basic freedoms that are designed to protect the individual against the tyrannical exertion of governmental power. For, in my judgment, one of the great purposes underlying the grant of those freedoms was to give independence to those who must discharge important public responsibilities. The legal profession, with responsibilities as great as those placed upon any group in our society, must have that independence. If it is denied them, they are likely to become nothing more than parrots of the views of whatever group wields governmental power at the moment. Wherever that has happened in the

world, the lawyer, as properly so called and respected, has ceased to perform the highest duty of his calling and has lost the affection and even the respect of the people.

Nor do I believe, as the majority asserts, that the discrimination here practiced is justified by virtue of the fact that the courts of England have for centuries exercised disciplinary powers "over members of the bar, incident to their broader responsibility for keeping the administration of justice and the standards of professional conduct unsullied." The rights of lawyers in this country are not, I hope, to be limited to the rights that English rulers chose to accord to their barristers hundreds of years ago. For it is certainly true that the courts of England could have then, as the majority points out, made "short shrift" of any barrister who refused to "co-operate" with the King's courts. Indeed, those courts did sometimes make "short shrift" of lawyers whose greatest crime was to dare to defend unpopular causes.[15] And in much the same manner, these same courts were at this same time using their "inherent" powers to make "short shrift" of juries that returned the wrong verdict.[16] History, I think, records

[15] The following excerpt from Hallam, The Constitutional History of England, Vol. I (2d ed.), at 477, indicates the extent to which this sort of thing was done in seventeenth-century England: "Two puritans having been committed by the high-commission court, for refusing the oath ex-officio, employed Mr. Fuller, a bencher of Gray's Inn, to move for their habeas corpus; which he did on the ground that the high commissioners were not empowered to commit any of his majesty's subjects to prison. This being reckoned a heinous offence, he was himself committed, at Bancroft's instigation, (whether by the king's personal warrant, or that of the council-board, does not appear) and lay in gaol to the day of his death . . . ."

[16] Hallam, op. cit., supra, n. 15, at 316, makes the following observation with regard to the duty of cooperation imposed upon English juries: "There is no room for wonder at any verdict that could be returned by a jury, when we consider what means the government possessed of securing it. The sheriff returned a pannel, either

that it was this willingness on the part of the courts of England to make "short shrift" of unpopular and uncooperative groups that led, first, to the colonization of this country, later, to the war that won its independence, and, finally to the Bill of Rights.[17]

When the Founders of this Nation drew up our Constitution, they were uneasily aware of this English practice, both as it had prevailed in that country and as it had been experienced in the colonies prior to the Revolution. Particularly fresh in their minds was the treatment that had been accorded the lawyers who had sought to defend John Peter Zenger against a charge of seditious libel before a royal court in New York in 1735.[18] These two

according to express directions, of which we have proofs, or to what he judged himself of the crown's intention and interest. If a verdict had gone against the prosecution in a matter of moment, the jurors must have laid their account with appearing before the starchamber; lucky, if they should escape, on humble retractation, with sharp words, instead of enormous fines and indefinite imprisonment."

[17] Judge Catron expressed the same point in *Vanzant* v. *Waddel, supra:* "The idea of a people through their representatives, making laws whereby are swept away the life, liberty and property of *one* or a *few* citizens, by which neither the representatives nor their other constituents are willing to be bound, is too odious to be tolerated in any government where freedom has a name. Such abuses resulted in the adoption of Magna Charta in England, securing the subject against odious exceptions, which is, and for centuries has been the foundation of English liberty. Its infraction was a leading cause why we separated from that country, and its value as a fundamental rule for the protection of the citizen against legislative usurpation, was the reason of its adoption as part of our constitution." 2 Yerger, at 270–271.

[18] See the Trial of John Peter Zenger, 17 Howell's State Trials 675. Zenger, a newspaper publisher, had seen fit to criticize the government and was being tried for printing "many things derogatory of the dignity of his majesty's government, reflecting upon the legislature, upon the most considerable persons in the most distinguished stations in the province, and tending to raise seditions and tumults among the people thereof." *Id.,* at 678.

lawyers had been summarily disbarred by the judges presiding at that trial for "having presumed, (notwithstanding they were forewarned by the Court of their displeasure, if they should do it) to sign, and having actually signed, and put into court, Exceptions, in the name of John Peter Zenger; thereby denying the legality of the judges their commissions . . . ." [19] It is to the lasting credit and renown of the colonial bar that Andrew Hamilton, a lawyer of Philadelphia, defied the hostility of the judges, defended and brought about the acquittal of Zenger. [20]

Unlike the majority today, however, the Founders were singularly unimpressed by the long history of such English practices. They drew up a Constitution with provisions that were intended to preclude for all time in this country the practice of making "short shrift" of anyone— whether he be lawyer, doctor, plumber or thief. Thus, it was provided that in this country, the basic "law of the land" must include, among others, freedom from bills of attainder, from *ex post facto* laws and from compulsory self-incrimination, and rights to trial by jury after indictment by grand jury and to assistance of counsel. [21] To make certain that these rights and freedoms would be accorded equally to everyone, it was also provided: *"No person* shall . . . be deprived of life, liberty, or property, without due process of law." [22] (Emphasis supplied.)

---

[19] *Id.,* at 686–687. The judges there preferred the label of "contempt" to that of "failure to co-operate."

[20] See Dictionary of American Biography, Vol. XX, at 648–649, for the story of Hamilton's successful defense of Zenger.

[21] Cf. *Chambers* v. *Florida,* 309 U. S. 227, 235–241, especially at 237, n. 10.

[22] That command, of course, originally applied only to the Federal Government. *Barron* v. *Baltimore,* 7 Pet. 243. But with the adoption in 1868 of the Fourteenth Amendment, the same command, together with the related requirement of equal protection of the laws, became binding upon the States.

142

The majority is holding, however, that lawyers are not entitled to the full sweep of due process protections because they had no such protections against judges or their fellow lawyers in England. But I see no reason why this generation of Americans should be deprived of a part of its Bill of Rights on the basis of medieval English practices that our Forefathers left England, fought a revolution and wrote a Constitution to get rid of.[23] This Court should say here with respect to due process and self-incrimination what it said with respect to the freedoms of speech and press in *Bridges* v. *California:* "[T]o assume that English common law in this field became ours is to deny the generally accepted historical belief that 'one of the objects of the Revolution was to get rid of the English common law on liberty of speech and of the press.' "[24]

Instead of applying the reasoning of the *Bridges* case to protect the right of lawyers to avail themselves of the privilege against self-incrimination, the majority departs from that reasoning in an opinion that threatens also to restrict the freedoms of speech, press and association. For, in addition to the bare holding that a lawyer may not avail

---

[23] The majority asserts that it is not only "the early beginning of the practice of judicial inquiry into attorney practices . . . [but also] the long life of that mode of procedure" that justifies its decision here. This argument—that constitutional rights are to be determined by long-standing practices rather than the words of the Constitution—is not, as the majority points out, a new one. It lay at the basis of two of this Court's more renowned decisions—*Dred Scott* v. *Sandford,* 19 How. 393, and *Plessy* v. *Ferguson,* 163 U. S. 537. But cf. *Brown* v. *Board of Education,* 347 U. S. 483. The notion that a violation of the plain language of the Constitution can gain legal stature by long-continued practice is not one I can subscribe to. A majority group, as de Tocqueville observed, too often "claims the right not only of making the laws, but of breaking the laws it has made." De Tocqueville, Democracy in America, Vol. 1, at 261.

[24] 314 U. S. 252, 264.

himself of the "law of the land" with respect to the privilege against self-incrimination, the opinion carries the plain implication that a lawyer is not to have the protection of the First Amendment with regard to his private beliefs and associations whenever his exercise of those freedoms might interfere with his duty to "co-operate" with a judge.[25]  It is, of course, possible that the majority will allow this process to go no further—that it will not disturb the few remaining constitutional safeguards of the lawyer's independence.  But I find no such promise in the majority's opinion.  On the contrary, I find in that opinion a willingness to give overriding effect to the lawyer's duty of "co-operation," even to the destruction of constitutional safeguards, and I cannot know how many constitutional safeguards would be sacrificed to this doctrine. Could a lawyer who refused to "co-operate" now be subjected to an unlawful search in an attempt to find evidence that he is guilty of something that a judge might later find to constitute "shady practices"?[26]  Could the court peremptorily confine a lawyer in jail for contempt until he agreed to "co-operate" with the court by foregoing his privilege against self-incrimination—or renouncing his freedom of speech?[27]  Or can American courts now emu-

---

[25] This implication stems from the majority's reliance upon its opinions in the companion cases, *Konigsberg* v. *State Bar of California, ante,* p. 36, and *In re Anastaplo, ante,* p. 82. If, as the majority says, there is no constitutional difference between admission and disbarment proceedings, it seems clear that lawyers may now be called in by a State and forced to disclose their political associations on a penalty of disbarment if they refuse to do so.

[26] The same point was persuasively urged by Mr. Justice Floyd of the Florida Supreme Court in a concurring opinion where that court refused to adopt the rule adopted by the New York court in this case.  See *Sheiner* v. *State,* 82 So. 2d 657, 664.

[27] As shown in notes 15 and 16, *supra,* the same arguments used to justify the decision in this case would also be applicable to the supposed case for it certainly cannot be denied that such a practice had the "sanction" of English history.

late the one-time practice of English courts of sending lawyers to jail for the "crime" of publicly advocating the repeal of laws that require people to incriminate them-selves? [28]    If the requirements of due process and equal protection of the laws are observed, we know that the answers to these questions would be, no.    But who knows how short "short shrift" can get?

The majority says that some of the evil practices I have referred to do not exist today and that they would now be held unconstitutional.    The Court does not mean, of course, that the people of this country have an "abso-lute" right not to be subjected to such practices.[29]    It means rather that a majority of this Court, *as presently constituted*, thinks that such practices are not "justified on balance."    But only 10 years ago, a different majority of this Court upheld summary imprisonment of the defense counsel in *Dennis* v. *United States*,[30] on a record which indicated that the primary reason for that impris-onment was the imputation to the lawyers of what the trial judge conceived of as the unpatriotic and treason-able designs of their clients.[31]    Even more recently, a

---

[28] Hallam, *op. cit., supra,* n. 15, at 287, reports the following event in early seventeenth-century England: "The oath ex officio, binding the taker to answer all questions that should be put to him, inasmuch as it contravened the generous maxim of English law that no one is obliged to criminate himself, provoked very just animadversion. Morice, attorney of the court of wards, not only attacked its legality with arguments of no slight force, but introduced a bill to take it away.    This was on the whole well received by the house; and sir Francis Knollys, the stanch enemy of episcopacy, though in high office, spoke in its favour.    But the queen put a stop to the pro-ceeding, and Morice lay some time in prison for his boldness."

[29] This much is made indisputably clear in the majority opinion in *Konigsberg* v. *State Bar of California, supra,* at 49–51.

[30] 341 U. S. 494.

[31] See *Sacher* v. *United States,* 343 U. S. 1, 19 (dissenting opinion). In my judgment the *Sacher* case is not altogether unlike the case of the lawyer Fuller discussed in n. 15, *supra.*

bare 5–4 majority of this Court prevented the temporary disbarment of a lawyer whose only "crime" lay in criticizing the manner in which the federal courts conduct trials for sedition.[32]  And today, this Court is upholding the refusal of two States to admit lawyers to their respective Bars solely because those lawyers would not renounce their rights under the First Amendment.[33]  The sad truth is that the majority is being unduly optimistic in thinking the practices I have mentioned do not exist today. They may have been disguised by description in different language but the practices themselves have not changed.

It seems to me that the majority takes a fundamentally unsound position when it endorses a practice based upon the artificial notion that rights and privileges can be stripped from a man in his capacity as a lawyer without affecting the rights and privileges of that man as a man. It is beyond dispute that one of the important ends served by the practice of law is that it provides a means of livelihood for the lawyer and those dependent upon him for support.  That means of earning a livelihood is not one that has been conferred upon the lawyer as a gift from the State.  Quite the contrary, it represents a substantial investment in time, money and energy on the part of the person who prepares himself to go into the legal profession.  Moreover, even after a lawyer has been admitted to practice, a further substantial investment must be made to enable the lawyer to build up the sort of goodwill that lies at the root of any successful practice.  Young lawyers must and do take on cases in which their ultimate fee is only a fraction of the real value of the work they

---

[32] *In re Sawyer*, 360 U. S. 622.  Cf. Trial of John Peter Zenger, *supra*.

[33] *Konigsberg* v. *State Bar of California*, decided today, *supra;* *In re Anastaplo*, decided today, *supra*.  The pressures being brought upon Konigsberg and Anastaplo are subtler than those brought upon such people as Morice (see note 28), but they are no less real.

put into the case in order to build up this sort of goodwill. The lawyer's abilities, acquired through long and expensive education, and the goodwill attached to his practice, acquired in part through uncompensated services, are capital assets that belong to the lawyer—both as a lawyer and as a man, assuming that such a conceptualistic distinction can be drawn.

These assets should be no more subject to confiscation than his home or any other asset he may have acquired through his industry and initiative. If they are used in violation of an already-existing, clear requirement of the law which pronounces as the penalty for violation confiscation of the assets, and if the violation is established in a proceeding in which all the requirements of the "law of the land" are satisfied, that is one thing.[34] But to confiscate the earning capacity that represents a large part of a lawyer's lifetime achievements on the theory that no such asset exists is quite another. The theory that the practice of law is nothing more than a privilege conferred by the State which it can destroy whenever it

---

[34] Thus, I am in complete agreement with the majority that, on a constitutional level, "[i]t is certainly not beyond the realm of permissible state concerns to conclude that too much attention to the business of getting clients may be incompatible with a sufficient devotion to duties which a lawyer owes to the court, or that the 'payment of awards to persons bringing in, legal business' is inconsistent with the personally disinterested position a lawyer should maintain." But that state concern in preventing "ambulance chasing" is certainly no greater than the state concern in preventing any other activity which it has seen fit to make a crime. Suspected "ambulance chasers" should be no more subject to the deprivation of due process and equal protection that stems from "procedures resulting in greater preventive certainty" than are suspected murderers. Indeed, it seems to me that if the question is to be decided on the basis of "state concern," there is no more justification for applying such summary procedures to "ambulance chasing" than for applying them to any other variety of crime.

can assert a "reasonable" justification for doing so seems to me to permit plain confiscation.

Even apart from the financial impact, the disbarment of a lawyer cannot help but have a tremendous effect upon that lawyer as a man. The dishonor occasioned by an official pronouncement that a man is no longer fit to follow his chosen profession cannot well be ignored. Such dishonor undoubtedly goes far toward destroying the reputation of the man upon whom it is heaped in the community in which he lives. And the suffering that results falls not only upon the disbarred lawyer but upon his family as well. Government certainly should not be allowed to do this to a man without according him the full benefit of the "law of the land," both constitutional and statutory.

In view of all this, I can see no justification for the notion that membership in the bar is a mere privilege conferred by the State and is therefore subject to withdrawal for the "breach" of whatever vague and indefinite "duties" the courts and other lawyers may see fit to impose on a case-by-case basis.[35] Nearly a century ago, an English judge observed, correctly I think, that "short of those heavy consequences which would attach to the greater and more heinous offences, I own I can conceive of no jurisdiction more serious than that by which a man may be deprived of his degree and status as a barrister, and which, in such a case—perhaps, after he has devoted the best years of his life to this arduous profession,—deprives him of his position as a member of that profession, and throws him back upon the world to commence a new career as best he may, stamped with dishonour and disgrace." [36]

---

[35] Cf. *Barsky* v. *Board of Regents, supra,* at 459, 472–474 (dissenting opinions).

[36] *Hudson* v. *Slade,* 3 Foster and Finlason (Q. B.) 390, 411.

But that is precisely what is happening here on the basis of nothing more than petitioner's "failure to co-operate" with the courts by reliance upon his constitutional privilege against self-incrimination. A man who has devoted thirty-nine years of his life to the practice of law and who, so far as this record shows, has never failed to perform those services faithfully and honorably is being dismissed from the profession in disgrace and is having his means of livelihood taken away from him at a point in his life when it seems highly unlikely that he will be able to find an adequate alternative means to support himself.

Quite differently from the majority, I think that the legal profession not only can but should endure what the majority refers to as the "disrespect which would result from the publicity, delay, and possible ineffectiveness in their exposure and eradication that might follow could miscreants only be dealt with through *ordinary investigatory and prosecutorial processes*." (Emphasis supplied.) Indeed, I cannot understand how any man in this country can assume that "publicity," "delay" and "ineffectiveness" brought on by observance of due process of law can ever be disrespectable. I am not at all certain, however, that the legal profession can survive in any form worthy of the respect we want it to have if its internal intergroup conflicts over professional ethics [37] are not rigidly confined by just those "ordinary investigatory and prosecutorial processes" which, though belittled by the majority today, are enshrined in the concepts of equal protection and due process. For if the legal profession can, with the aid of those members of

---

[37] The true nature of the underlying controversy in this case, as a controversy between economically competing groups of lawyers, is shown by the fact that four different associations of attorneys filed briefs as *amici curiae* in the present proceeding—two favorable to petitioner and two favorable to respondent.

the profession who have become judges, exclude any member it wishes even though such exclusion could not be accomplished within the limits of the same kind of due process that is accorded to other people, how is any lawyer going to be able to take a position or defend a cause that is likely to incur the displeasure of the judges or whatever group of his fellow lawyers happens to have authority over him? [38]   The answer is that in many cases he is not going to be able to take such a position or to defend such a cause and the public will be deprived of just those legal services that, in the past, have given lawyers their most bona fide claim to greatness.

It may be that petitioner has been guilty of some violation of law which if legally proved would justify his disbarment.   It is only fair to say, however, that there is not one shred of evidence in this record to show such a violation.   And petitioner is entitled to every presumption of innocence until and unless such a violation has been charged and proved in a proceeding in which he, like other citizens, is accorded the protection of all of the safeguards guaranteed by the requirements of equal protection and due process of law.   This belief that lawyers too are entitled to due process and equal protection of the laws will not, I hope, be regarded as too new or too novel.

The great importance of observing due process of law, though to some extent familiar to lawyers and laymen alike, is sometimes difficult for laymen to understand. Courts have often had to rely upon lawyers and their familiarity with the wisdom underlying these processes

---

[38] The immense danger of departures from due process to lawyers who represent unpopular causes is dramatically illustrated in *Sacher* v. *United States, supra.*  Cf. *United States ex rel. Goldsby* v. *Harpole,* 263 F. 2d 71, 82, for a discussion of another situation in which the independence of the lawyer may be crucial to his ability adequately to defend his client.

to explain the need for time-consuming procedures to impatient laymen. Such impatience is understandable when it comes from laymen—but it is regrettable to find it in lawyers. The respect for a rule of law administered through due process of law is the very hallmark of a lawyer—without it he cannot keep faith with his profession.

· MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK concurs, dissenting.

The privilege against self-incrimination contained in the Fifth Amendment has an honorable history and should not be downgraded as it is today. Levi Lincoln, Attorney General, objected in the hearing of *Marbury* v. *Madison*, 1 Cranch 137, 144, to answering certain questions on the ground that the answers might tend to criminate him.[1] See Warren, The Supreme Court in United States History (1937), Vol. I, p. 237. The Court, then headed by Chief Justice Marshall, respected the privilege.[2] Neither he nor any Justice even intimated that it was improper for a lawyer to invoke his constitutional rights. They knew that the Fifth Amendment was designed to protect the

---

[1] As reported in The Aurora for February 15, 1803, Levi Lincoln stated to the Court "[t]hat if the court should upon the questions being submitted in writing determine that he was bound to answer them, another difficulty would suggest itself upon the principles of evidence; he would suppose the case to assume its most serious form, if in the course of his official duty these commissions should have come into his hands, and that he might either by error or by intention have done wrong, it would not be expected that he should give evidence to criminate himself. This was an extreme case, and he used only to impress upon the court the nature of the principle in the strongest terms."

[2] The Court, as reported in 1 Cranch, at 144, said that the Attorney General was not obliged "to state any thing which would criminate himself."

innocent as well as the guilty. What the Court did that day reflected the attitude expressed by the Court in 1956 in *Slochower* v. *Board of Education,* 350 U. S. 551, 557–558, when we said, "The privilege against self-incrimination would be reduced to a hollow mockery if its exercise could be taken as equivalent either to a confession of guilt or a conclusive presumption of perjury. . . . The privilege serves to protect the innocent who otherwise might be ensnared by ambiguous circumstances."

The lawyer in this case is in the same need of that protection as was the Attorney General in *Marbury* v. *Madison* and the professor in the *Slochower* case.

The American philosophy of the Fifth Amendment was dynamically stated by President Andrew Jackson who replied as follows to a House Committee investigating the spoils system:

> "[Y]ou request myself and the heads of the departments to become our own accusers, and to furnish the evidence to convict ourselves." H. R. Rep. No. 194, 24th Cong., 2d Sess., p. 31.

President Grant took long absences from Washington, D. C., for recreational purposes. A House resolution asked Grant to list all his executive acts, since his election, which had been "performed at a distance from the seat of government established by law," together with an explanation of the necessity "for such performance." Grant declined, stating that if the information was wanted for purposes of impeachment ". . . it is asked in derogation of an inherent natural right, recognized in this country by a constitutional guarantee which protects every citizen, the President as well as the humblest in the land, from being made a witness against himself." 4 Cong. Rec., Pt. 3, 44th Cong., 1st Sess., p. 2999; H. Jour., 44th Cong., 1st Sess., p. 917.

A faithful account of the Fifth Amendment was given by Simon H. Rifkind, formerly a federal judge in the Southern District of New York who served with distinction from 1941 to 1950. He said in an address on May 3, 1954: [3]

"Far and wide, currency has been given to what I regard as the mischievous doctrine, the unconstitutional and historically false doctrine that the plea of the Fifth Amendment is an admission of guilt, an act of subversion, a badge of disloyalty.

"I confess that when I hear the words 'Fifth Amendment Communist' spoken, I experience a sense of revulsion. In that phrase I detect a denial of seven centuries of civilizing growth in our law, a repudiation of that high regard for human dignity which is the proud hallmark of our law. That phrase makes a mockery of a practice of every court in our land—a practice which is so well-accepted that we take it for granted: Has any of you ever seen a prosecutor call a defendant to the witness stand? Of course not; you are shocked, I hope, at the suggestion. A defendant takes the stand only of his own free will. Nor do we speak of 'Fifth Amendment burglars,' 'Fifth Amendment traffic violators,' or 'Fifth Amendment anti-trust law violators.' Nor, for that matter, would I speak of 'Fifth and Sixth Amendment Senators.' But I do seem to recall that when the actions of a Senator recently came under investigation, he hastened to insure that he would have the right to confront and cross-examine his accusers. He demanded that a statement of the charges be made available to him, and he insisted that he be allowed

---

[3] Rifkind, Reflections on Civil Liberties (American Jewish Committee), pp. 12–13.

to compel the attendance of witnesses in his own behalf.

"This is not the time to go into the hoary history of the Fifth Amendment, but this much is clear: The privilege to remain silent was regarded by our ancestors as the inalienable right of a free man. To compel a man to accuse himself was regarded as a cruelty beneath the tolerance of civilized people, and it simply is not true as a matter of law that only the guilty are privileged to plead the Fifth Amendment. The innocent too have frequent occasion to seek its beneficent protection."

There is no exception in the Fifth Amendment for lawyers any more than there is for professors, Presidents, or other office holders.

I believe that the States are obligated by the Due Process Clause of the Fourteenth Amendment to accord the full reach of the privilege to a person who invokes it. See *Adamson* v. *California,* 332 U. S. 46, 68 (dissenting opinion); *Scott* v. *California,* 364 U. S. 471 (dissenting opinion)—a position which MR. JUSTICE BRENNAN today strengthens and reaffirms. In the disbarment proceedings, petitioner relied not only on the state constitution but on the Due Process Clause of the Fourteenth Amendment, contending that it forbade the State's making his silence the basis for his disbarment. I agree with that view. Moreover, apart from the Fifth Amendment, I do not think that a State may require self-immolation as a condition of retaining the license of an attorney. When a State uses petitioner's silence to brand him as one who has not fulfilled his "inherent duty and obligation . . . as a member of the legal profession," it adopts a procedure that does not meet the requirements of due process. Taking away a man's right to practice law is imposing a

penalty as severe as a criminal sanction, perhaps more so. The State should carry the burden of proving guilt. The short-cut sanctioned today allows proof of guilt to be "less than negligible." *Grunewald* v. *United States,* 353 U. S. 391, 424.

Mr. Justice Brennan, with whom The Chief Justice joins, dissenting.

I would reverse because I think that the petitioner was protected by the immunity from compulsory self-incrimination guaranteed by the Fifth Amendment, which in my view is absorbed by the Fourteenth Amendment, and therefore is secured against impairment by the States.

In *Barron* v. *Baltimore,* 7 Pet. 243, decided in 1833, the Court held that it was without jurisdiction to review a judgment of the Maryland Court of Appeals which denied an owner compensation for his private property taken for public use. Chief Justice Marshall wrote that, contrary to the contention of the owner, "the provision in the fifth amendment to the constitution, declaring that private property shall not be taken for public use without just compensation, is intended solely as a limitation on the exercise of power by the government of the United States, and is not applicable to the legislation of the states." This, he said, was because the first eight Amendments "contain no expression indicating an intention to apply them to the state governments. This Court cannot so apply them." 7 Pet., pp. 250–251. For over a quarter of a century after the adoption of the Fourteenth Amendment in 1868, this holding was influential in many decisions of the Court which rejected arguments for the application to the States of one after another of the specific guarantees included in the Federal Bill of Rights. See *Knapp* v. *Schweitzer,* 357 U. S. 371, 378–379, note 5, where the cases are collected.

In 1897, however, the Court decided *Chicago, B. & Q. R. Co.* v. *Chicago,* 166 U. S. 226. That case also challenged the constitutionality of a judgment of a State Supreme Court, that of Illinois, alleged to have sustained a taking of private property for public purposes without just compensation. But the property owner could now invoke the Fourteenth Amendment against the State. The Court held that the claim based on that Amendment was cognizable by the Court. On the merits, the first Mr. Justice Harlan wrote, "In our opinion, a judgment of a state court, even if it be authorized by statute, whereby private property is taken for the State or under its direction for public use, without compensation made or secured to the owner, is, upon principle and authority, wanting in the due process of law required by the Fourteenth Amendment of the Constitution of the United States, and the affirmance of such judgment by the highest court of the State is a denial by that State of a right secured to the owner by that instrument." 166 U. S., p. 241. Thus the Court, in fact if not in terms, applied the Fifth Amendment's just-compensation requirement to the States, finding in the Fourteenth Amendment a basis which Chief Justice Marshall in *Barron* found lacking elsewhere in the Constitution.

But if suitors in state cases who invoked the protection of individual guarantees of the Bill of Rights were no longer to be turned away by the Court with Marshall's summary "This court cannot so apply them," neither was the Court to give encouragement that all specifics in the federal list would be applied as was the Just Compensation Clause. Although there were Justices as early as 1892, see *O'Neil* v. *Vermont,* 144 U. S. 323, 337, 366 (dissenting opinions), as there are Justices today, see dissent of MR. JUSTICE DOUGLAS herein and *Adamson* v. *California,* 332 U. S. 46, 68 (dissenting opinion), urging the view that the Fourteenth Amendment carried over intact the

first eight Amendments as limitations on the States, the course of decisions has not so far followed that view. Additional specific guarantees have, however, been applied to the States. For example, while as recently as 1922, *Prudential Ins. Co.* v. *Cheek,* 259 U. S. 530, 543, the Court had said that the Fourteenth Amendment did not make the protections of the First Amendment binding on the States, decisions since 1925 have extended against state power the full panoply of the First Amendment's protections for religion, speech, press, assembly, and petition. See, *e. g., Gitlow* v. *New York,* 268 U. S. 652, 666; *Cantwell* v. *Connecticut,* 310 U. S. 296, 303; *West Virginia State Board of Education* v. *Barnette,* 319 U. S. 624; *Near* v. *Minnesota ex rel. Olson,* 283 U. S. 697, 707; *DeJonge* v. *Oregon,* 299 U. S. 353, 364; *Bridges* v. *California,* 314 U. S. 252, 277. The view occasionally expressed that the freedom of speech and the press may be secured by the Fourteenth Amendment less broadly than it is secured by the First, see *Beauharnais* v. *Illinois,* 343 U. S. 250, 288 (dissenting opinion); *Roth* v. *United States,* 354 U. S. 476, 505–506 (separate opinion); *Smith* v. *California,* 361 U. S. 147, 169 (separate opinion), has never persuaded even a substantial minority of the Court. Again, after saying in 1914 that "the Fourth Amendment is not directed to individual misconduct of [state] . . . officials. Its limitations reach the Federal Government and its agencies," *Weeks* v. *United States,* 232 U. S. 383, 398, the Court held in 1949 that "[t]he security of one's privacy against arbitrary intrusion by the police . . . is . . . implicit in 'the concept of ordered liberty' and as such enforceable against the States . . . ." *Wolf* v. *Colorado,* 338 U. S. 25, 27–28; and see *Elkins* v. *United States,* 364 U. S. 206.

This application of specific guarantees to the States has been attended by denials that this is what in fact is being done. The insistence has been that the applica-

tion to the States of a safeguard embodied in the first eight Amendments is not made "because those rights are enumerated in the first eight Amendments, but because they are of such a nature that they are included in the conception of due process of law." *Twining* v. *New Jersey*, 211 U. S. 78, 99. In other words, due process is said to be infused with "an independent potency" not resting upon the Bill of Rights, *Adamson* v. *California*, 332 U. S. 46, 66 (concurring opinion). It is strange that the Court should not have been able to detect this characteristic in a single specific when it rejected the application to the States of virtually every one of them in the three decades following the adoption of the Fourteenth Amendment. Since "[f]ew phrases of the law are so elusive of exact apprehension as . . . [due process of law] . . . [and] . . . its full meaning should be gradually ascertained by the process of inclusion and exclusion in the course of the decisions of cases as they arise," *Twining* v. *New Jersey, supra,* at 99–100, this formulation has been a convenient device for leaving the Court free to select for application to the States some of the rights specifically mentioned in the first eight Amendments, and to reject others. But surely it blinks reality to pretend that the specific selected for application is not really being applied. Mr. Justice Cardozo more accurately and frankly described what happens when he said in *Palko* v. *Connecticut*, 302 U. S. 319, 326, that guarantees selected by the Court "have been taken over from the earlier articles of the federal bill of rights and brought within the Fourteenth Amendment by a *process of absorption. . . .*" (Italics supplied.)

Many have had difficulty in seeing what justifies the incorporation into the Fourteenth Amendment of the First and Fourth Amendments which would not similarly justify the incorporation of the other six. Even if I assume, however, that, at least as to some guarantees,

there are considerations of federalism—derived from our tradition of the autonomy of the States in the exercise of powers concerning the lives, liberty, and property of state citizens—which should overbear the weighty arguments in favor of their application to the States, I cannot follow the logic which applies a particular specific for some purposes and denies its application for others. If we accept the standards which justify the application of a specific, namely that it is "of the very essence of a scheme of ordered liberty," *Palko* v. *Connecticut, supra,* p. 325, or is included among "those fundamental principles of liberty and justice which lie at the base of all our civil and political institutions," *Hurtado* v. *California,* 110 U. S. 516, 535, or is among those personal immunities "so rooted in the traditions and conscience of our people as to be ranked as fundamental," *Snyder* v. *Massachusetts,* 291 U. S. 97, 105, surely only impermissible subjective judgments can explain stopping short of the incorporation of the full sweep of the specific being absorbed. For example, since the Fourteenth Amendment absorbs in capital cases the Sixth Amendment's requirement that an accused shall have the assistance of counsel for his defense, *Powell* v. *Alabama,* 287 U. S. 45, I cannot see how a different or greater interference with a State's system of administering justice is involved in applying the same guarantee in noncapital cases. Yet our decisions have limited the absorption of the guarantee to such noncapital cases as on their particular facts "render criminal proceedings without counsel so apt to result in injustice as to be fundamentally unfair . . . ," *Uveges* v. *Pennsylvania,* 335 U. S. 437, 441; see also *Betts* v. *Brady,* 316 U. S. 455. But see *McNeal* v. *Culver,* 365 U. S. 109, 117 (concurring opinion). This makes of the process of absorption "a license to the judiciary to administer a watered-down, subjective version of the individual guarantees of the Bill of Rights when state cases come before

us," which, I said in *Ohio ex rel. Eaton* v. *Price,* 364 U. S. 263, 275 (dissenting opinion), I believe to be indefensible.

The case before us presents, for me, another situation in which the application of the full sweep of a specific is denied, although the Court has held that its restraints are absorbed in the Fourteenth Amendment for some purposes. Only this Term we applied, admittedly not in terms but nevertheless in fact, the privilege against compulsory self-incrimination guaranteed by the Fifth Amendment to invalidate a state conviction obtained with the aid of a confession, however true, which was secured from the accused by duress or coercion. *Rogers* v. *Richmond,* 365 U. S. 534; and see *Bram* v. *United States,* 168 U. S. 532. And not too long ago we invalidated a state conviction for illegal possession of morphine based on evidence of two capsules which the accused had swallowed and then had been forced by the police to disgorge. *Rochin* v. *California,* 342 U. S. 165. But the Court today relies upon earlier statements that the immunity from compulsory self-incrimination is not secured by the Fourteenth Amendment against impairment by the States. These statements appear primarily in *Twining* v. *New Jersey, supra,* and *Adamson* v. *California, supra.* Those cases do not require the conclusion reached here. Neither involved the question here presented of the constitutionality of a penalty visited by a State upon a citizen for invoking the privilege. Both involved only the much narrower question whether comment upon a defendant's failure to take the stand in his own defense was constitutionally permissible.

However, all other reasons aside, a cloud has plainly been cast on the soundness of *Twining* and *Adamson* by our decisions absorbing the First and Fourth Amendments in the Fourteenth. There is no historic or logical reason for supposing that those Amendments secure more important individual rights. I need not rely only on

Mr. Justice Bradley's famed statement in *Boyd* v. *United States,* 116 U. S. 616, 632, that compulsory self-incrimination "is contrary to the principles of a free government. It is abhorrent to the instincts of an . . . American. It may suit the purposes of despotic power; but it cannot abide the pure atmosphere of political liberty and personal freedom." I may also call to my support the more current appraisal in the same vein in *Ullmann* v. *United States,* 350 U. S. 422, 426–428. The privilege is rightly designated "one of the great landmarks in man's struggle to make himself civilized." Griswold, The Fifth Amendment Today, (1955) 7. But even without the support of these eminent authorities, I believe that the unanswerable case for absorption was stated by the first Mr. Justice Harlan in his dissent in *Twining, supra,* p. 114. Therefore, with him, "I cannot support any judgment declaring that immunity from self-incrimination is not . . . a part of the liberty guaranteed by the Fourteenth Amendment against hostile state action." *Id.,* at 126. The degree to which the privilege can be eroded unless deterred by the Fifth Amendment's restraints is forcefully brought home in this case by the New York Court of Appeals' departure from its former precedents. See Judge Fuld's dissent, 7 N. Y. 2d 488, 498, 166 N. E. 2d 672, 677.

I would hold that the full sweep of the Fifth Amendment privilege has been absorbed in the Fourteenth Amendment. In that view the protection it affords the individual, lawyer or not, against the State, has the same scope as that against the National Government, and, under our decision in *Slochower* v. *Board of Education,* 350 U. S. 551, the order under review should be reversed.