**Gary T. BISHOP, Plaintiff,**

v.

**The COMMITTEE ON PROFESSIONAL ETHICS AND CONDUCT OF the IOWA STATE BAR ASSOCIATION, and its Chairman, James E. Cooney, in his official capacity, Defendants.**

**Civ. No. 81–47–D.**

United States District Court,
S. D. Iowa,
Central Division.

Aug. 20, 1981.

Gordon E. Allen, Leslie Babich & Mark W. Bennett, Allen, Babich & Bennett, Des Moines, Iowa, for plaintiff.

Lee Gaudineer & Carlton G. Salmons, Hedo M. Zacherle, Des Moines, Iowa, for defendants.

## MEMORANDUM OPINION, JUDGMENT, INJUNCTION AND ORDERS

VIETOR, District Judge.

Plaintiff is a lawyer licensed by and practicing law in the state of Iowa. On January 22, 1981, he filed this action under 42 U.S.C. § 1983, with jurisdiction predicated on 28 U.S.C. § 1343, challenging the constitutionality of The Disciplinary Rules of the Iowa Code of Professional Responsibility for Lawyers limiting the means and content

of lawyer advertising. Plaintiff seeks declaratory and injunctive relief against the defendants, the Committee on Professional Ethics and Conduct of the Iowa State Bar Association, and its chairman, James E. Cooney, in his official capacity. Trial was held on June 11, 1981.

## FACTS

Until recent times, advertising by lawyers setting forth fees and other information was prohibited in Iowa, as it was elsewhere in the United States.[1] Then, in *Bates v. State Bar of Arizona*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977), the United States Supreme Court held that the First Amendment to the Constitution of the United States, which is applicable to the states through the Fourteenth Amendment, precludes the state from prohibiting a lawyer from publishing in a newspaper his truthful advertisement concerning the availability and fees of routine legal services offered by him.

In the wake of the *Bates* decision, the Iowa Supreme Court amended the Iowa Code of Professional Responsibility for Lawyers to permit lawyers to advertise their services and fees within the regulatory limits of the Code as amended.[2]

Iowa Supreme Court Rule 118.2 provides: The members of the Committee on Professional Ethics and Conduct of the Iowa State Bar Association and their successors, as confirmed by order of this court are appointed commissioners of this court to initiate or receive, and process complaints against any attorney licensed to practice law in this state for alleged violations of the Iowa Code of Professional Responsibility for Lawyers and laws of the United States or the state of Iowa. Upon completion of any such investigation the committee on professional ethics and conduct shall either dismiss the complaint made, or admonish or reprimand the complained against attorney, or file

and prosecute the complaint before the grievance commission or any division thereof.

The defendant Committee on Professional Ethics and Conduct of the Iowa State Bar Association intends, by appropriate actions, to enforce the Disciplinary Rules of the Iowa Code of Professional Responsibility for Lawyers governing advertising by lawyers.

Plaintiff graduated from Drake University Law School in December of 1979 and was admitted to practice in the Iowa courts in June of 1980. He is also admitted to practice in this court and in the United States District Court for the Northern District of Iowa. He is a member of the American Bar Association, the Iowa Bar Association and two county bar associations in Iowa. He maintains his principal office in Davenport and another office in Muscatine, both in the Southern District of Iowa. At present, another lawyer, who is black, is associated with him.

In plaintiff's law practice, he primarily handles routine matters such as uncontested dissolutions of marriage, uncontested bankruptcies, adoptions, simple wills, real estate closings, title opinions, etc. His office is organized to provide these routine legal services, which constitute about 80 to 85% of his practice.

Plaintiff is not an Iowa native and testified that he has no contacts in Iowa and that he therefore needs to advertise in order to attract clients. Since beginning his practice, he has advertised in newspapers of general circulation and in the Muscatine yellow pages. He testified that about 80% of his clients come to his office directly as a result of advertising. His advertising has been within the limits allowed by the Disciplinary Rules of the Iowa Code of Professional Conduct for Lawyers, but he wishes to employ additional means of advertising and use additional advertising content that

---

1. *See Bates v. State Bar of Arizona*, 433 U.S. 350, 362 & n.15, 97 S.Ct. 2691, 2698 n.15, 53 L.Ed.2d 810 (1977).

2. The Iowa Code of Professional Responsibility for Lawyers is found at pages 3648 through 3681 of Volume III of the 1981 Code of Iowa. The Disciplinary Rules governing lawyer advertising appear at pages 3655 through 3661, and are set forth in the Appendix hereto.

are prohibited by the Disciplinary Rules. It is his contention that he has a First Amendment commercial speech right to do so, and that the restrictions of the Disciplinary Rules infringe on this right.

## GOVERNING LAW

Plaintiff's specific challenges to the Disciplinary Rules can best be examined after first considering the governing principles of law.

The first state regulation prohibiting price advertising by members of a profession to be held violative of the First Amendment was Virginia's law prohibiting pharmacists from advertising prescription drug prices. *Virginia Pharmacy Bd. v. Virginia Consumer Council*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). The Court expressly reserved the question of whether advertising bans on other professions also offended the First Amendment, stating:

> We stress that we have considered in this case the regulation of commercial advertising by pharmacists. Although we express no opinion as to other professions, the distinctions, historical and functional, between professions, may require consideration of quite different factors. Physicians and lawyers, for example, do not dispense standardized products; they render professional *services* of almost infinite variety and nature, with the consequent enhanced possibility for confusion and deception if they were to undertake certain kinds of advertising.

*Id.* at 773 n.25, 96 S.Ct. at 1831 n.25.

The reserved question in respect to lawyer advertising was answered the following year by the Court's decision in *Bates v. State Bar of Arizona, supra.* However, the holding in *Bates* was limited. The Court concluded:

> The constitutional issue in this case is *only* whether the State may prevent the publication in a newspaper of appellants' truthful advertisement concerning the availability and terms of routine legal services. We rule simply that the flow of such information may not be restrained, and we therefore hold the present appli-

cation of the disciplinary rule against appellants to be violative of the First Amendment. [Emphasis supplied.]

*Bates v. State Bar of Arizona, supra,* 433 U.S. at 384, 97 S.Ct. at 2709. Most of the questions presented in the instant case were not answered by *Bates.*

*Bates* is a "commercial speech" case. Commercial speech is "expression related solely to the economic interests of the speaker and its audience." *Central Hudson Gas & Elec. Corp. v. Public Service Comm'n,* 447 U.S. 557, 561, 100 S.Ct. 2313, 2349, 65 L.Ed.2d 341 (1980). Justice Powell, writing the opinion of the Court in *Central Hudson Gas & Elec. Corp. v. Public Service Comm'n, supra,* 447 U.S. at 561–64, 100 S.Ct. at 2349–50, articulates the rationale as well as the scope and limitations of the First Amendment's protection of commercial speech:

> The First Amendment, as applied to the States through the Fourteenth Amendment, protects commercial speech from unwarranted governmental regulation. *Virginia Pharmacy Board,* 425 U.S. at 761–762 [96 S.Ct. at 1825]. Commercial expression not only serves the economic interest of the speaker, but also assists consumers and furthers the societal interest in the fullest possible dissemination of information. In applying the First Amendment to this area, we have rejected the "highly paternalistic" view that government has complete power to suppress or regulate commercial speech. "[P]eople will perceive their own best interests if only they are well enough informed, and ... the best means to that end is to open the channels of communication, rather than to close them...." *Id.,* at 770 [96 S.Ct. at 1829]; see *Linmark Associates, Inc. v. Willingboro,* 431 U.S. 85, 92 [97 S.Ct. 1614, 1618, 52 L.Ed.2d 155] (1977). Even when advertising communicates only an incomplete version of the relevant facts, the First Amendment presumes that some accurate information is better than no information at all. *Bates v. State Bar of Arizona, supra,* [433 U.S.] at 374, [97 S.Ct. at 2704].

Nevertheless, our decisions have recognized "the 'commonsense' distinction be-

tween speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech." *Ohralik v. Ohio State Bar Assn.*, 436 U.S. 447, 455–456 [98 S.Ct. 1912, 1918, 56 L.Ed.2d 44] (1978); see *Bates v. State Bar of Arizona, supra*, [433 U.S.] at 381 [97 S.Ct. at 2707–08]; see also Jackson & Jeffries, Commercial Speech: Economic Due Process and the First Amendment, 65 Va.L.Rev. 1, 38–39 (1979). The Constitution therefore accords a lesser protection to commercial speech than to other constitutionally guaranteed expression. 436 U.S., at 456, 457 [98 S.Ct. at 1918, 1919]. The protection available for particular commercial expression turns on the nature both of the expression and of the governmental interests served by its regulation.

The First Amendment's concern for commercial speech is based on the informational function of advertising. See *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 783 [98 S.Ct. 1407, 1419, 55 L.Ed.2d 707] (1978). Consequently, there can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity. The government may ban forms of communication more likely to deceive the public than to inform it, *Friedman v. Rogers, supra*, [440 U.S. 1] at 13, 15–16 [99 S.Ct. 887, 896, 897, 59 L.Ed.2d 100]; *Ohralik v. Ohio State Bar Assn., supra* [436 U.S.] at 464–465 [98 S.Ct. at 1922–23], or commercial speech related to illegal activity, *Pittsburgh Press Co. v. Human Relations Comm'n*, 413 U.S. 376, 388 [93 S.Ct. 2553, 2560, 37 L.Ed.2d 669] (1973).

If the communication is neither misleading nor related to unlawful activity, the government's power is more circumscribed. The State must assert a substantial interest to be achieved by restrictions on commercial speech. Moreover, the regulatory technique must be in proportion to that interest. The limitation on expression must be designed carefully to achieve the State's goal. Compliance with this requirement may be measured by two criteria. First, the restriction must directly advance the state interest involved; the regulation may not be sustained if it provides only ineffective or remote support for the government's purpose. Second, if the governmental interest could be served as well by a more limited restriction on commercial speech, the excessive restrictions cannot survive. [Footnotes omitted.]

Justice Powell summarized the analysis required in commercial speech cases as follows:

In commercial speech cases, then, a four-part analysis has developed. At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

*Id.* at 566, 100 S.Ct. at 2351.

It is undisputed that the state may regulate the legal profession. In *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 44 (1978), the Supreme Court observed:

In addition to its general interest in protecting consumers and regulating commercial transactions, the State bears a special responsibility for maintaining standards among members of the licensed professions. See *Williamson v. Lee Optical Co.*, 348 U.S. 483 [75 S.Ct. 461, 99 L.Ed. 563] (1955); *Semler v. Oregon State Bd. of Dental Examiners*, 294 U.S. 608 [55 S.Ct. 570, 79 L.Ed. 1086] (1935). "The interest of the States in regulating lawyers is especially great since lawyers are essential to the primary governmental function of administering justice, and have historically been 'officers of the courts.'" *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 792 [95 S.Ct. 2004, 2016, 44

L.Ed.2d 572] (1975). While lawyers act in part as "self-employed businessmen," they also act "as trusted agents of their clients, and as assistants to the court in search of a just solution to disputes." *Cohen v. Hurley*, 366 U.S. 117, 124 [81 S.Ct. 954, 958, 6 L.Ed.2d 156] (1961). *Id.* at 460, 98 S.Ct. at 1920–21. *See Bates v. State Bar of Arizona, supra*, 433 U.S. at 360–61, 97 S.Ct. at 2697–98.

In connection with the state's power to regulate the legal profession, it is appropriate to note the following observation of Justice Harlan:

> It is no less true than trite that lawyers must operate in a three-fold capacity, as self-employed businessmen as it were, as trusted agents of their clients, and as assistants to the court in search of a just solution to disputes. It is certainly not beyond the realm of permissible state concerns to conclude that too much attention to the business of getting clients may be incompatible with a sufficient devotion to duties which a lawyer owes to the court, or that the "payment of awards to persons bringing in legal business" is inconsistent with the personally disinterested position a lawyer should maintain.

*Cohen v. Hurley*, 366 U.S. 117, 124, 81 S.Ct. 954, 959, 6 L.Ed.2d 156 (1961).

### PLAINTIFF'S CHALLENGES TO CONTENT LIMITATIONS

Plaintiff asserts no challenge to DR 2–101(A)'s prohibition against advertising containing "a false, fraudulent, misleading, deceptive, self-laudatory or unfair statement." He does, however, challenge DR 2–101(A)'s prohibitions against advertising by a lawyer:

1. "* * * which contains any information not hereafter specifically permitted."

2. "* * * which contains any statement or claim relating to the quality of his legal services, * * *."

3. "* * * which appeals to the emotions, prejudices, or likes or dislikes of a person * * *."

4. "* * * [which contains] subjective characterizations of his rates or fees, such as, but not limited to, 'cut-rate,' 'lowest,' 'reasonable,' 'moderate,' 'very reasonable,' 'give-away,' 'below-cost,' 'special.'

5. "* * * [which contains any signs or symbols] such as, but not limited to, logos, trademarks, graphics, design work, and pictures."

The Disciplinary Rules governing lawyer advertising list specific fact information that may be contained in a lawyer's advertisement. In challenging the prohibition against placing in an ad "any information not hereafter specifically permitted," plaintiff does not identify any information that he believes should be permitted, except the lawyer's race, expression of views, and certain expressly prohibited material. Therefore, except for the questions of the lawyer's race and expression of views, a consideration of his challenges to expressly prohibited material will necessarily constitute a consideration of his challenge to the prohibition of "any information not * * * specifically permitted."

In considering plaintiff's challenges to content prohibitions of the Disciplinary Rules governing lawyer advertising, it should first be observed that most advertising content consists of two parts, the factual or informational content and the promotional or persuasive content. Factual content consists of specific definable, measurable, demonstrative matters and operates at the conscious level. Promotional content, such as modifiers ("best," "quality," "competent," "reasonable," "moderate," "cheap," etc.), logos, drawings, sounds, sights, colors, lighting effects, dramatizations, etc., often operates at the unconscious level. Promotional content of advertising is potentially deceptive or misleading.[3] It should also be observed that all of the content expressly

---

**3.** These observations rest on the credible portion of the testimony of the defendants' expert witness, Wilson Bryan Key, Ph.D. I did not find all of his opinion testimony, particularly some of his views elicited on cross-examination concerning subliminal "sexploitation" advertising, to be very persuasive.

permitted by the Disciplinary Rules is factual, and most of the specific prohibitions of the Disciplinary Rules relate to promotional content.

### Quality Claims

In respect to the prohibition against claims of quality of an advertising lawyer's legal services, plaintiff concedes that the state has an interest in regulating such claims and that superlative claims, such as "exceptional quality legal services" or "the best legal services in town," are likely to be misleading and can properly be prohibited. But plaintiff argues that he has a First Amendment right to assert in his advertisements at least restrained claims of quality, such as using words like "competent" and "trustworthy." He contends that the state has verified his competence and trustworthiness by admitting him to the bar.[4] Unfortunately, experience shows that not all lawyers who have been admitted to practice are in fact competent or trustworthy.

In *Bates v. State Bar of Arizona, supra,* 433 U.S. at 383–84, 97 S.Ct. at 2709–10, the Court noted:

[B]ecause the public lacks sophistication concerning legal services, misstatements that might be overlooked or deemed unimportant in other advertising may be found quite inappropriate in legal advertising. For example, advertising claims as to the quality of services—a matter we do not address today—are not susceptible of measurement or verification; accordingly, such claims may be so likely to be misleading as to warrant restriction. [Footnote omitted.]

The Court went on to observe: "[W]e recognize that many of the problems in defining the boundary between deceptive and nondeceptive advertising remain to be re-

solved, and we expect that the bar will have a special role to play in assuring that advertising by attorneys flows both freely and *cleanly." Id.* at 384, 97 S.Ct. at 2709 (emphasis supplied).

The governmental interest in precluding any possible misleading content in lawyer advertising is clearly substantial, and any claim of quality, even a restrained one, has some potential to be misleading, especially because not every lawyer in fact offers quality legal services. A total prohibition on any claims of quality directly advances the governmental interest, and is not more extensive than is necessary to serve that interest. *See Central Hudson Gas & Elec. Corp. v. Public Service Comm'n, supra,* 447 U.S. at 566, 100 S.Ct. at 2351.

The prohibition against any claim of quality does not violate plaintiff's First Amendment right of commercial speech.

### Appeals to Emotions, Etc.

In respect to the prohibition against "appeals to the emotions, prejudices, or likes or dislikes of a person," plaintiff argues that "the entire function of advertising is to appeal to the likes or dislikes of people, and to a certain extent, to their emotions and prejudices, as well." That may well be the function of product advertising, but it certainly should never be the function of advertising of a lawyer's services. Such appeals are inherently misleading and clearly may, and should, be prohibited by the state. The four-part analysis articulated in *Central Hudson Gas & Elec. Corp. v. Public Service Comm'n, supra,* 447 U.S. at 566, 100 S.Ct. at 2351, inescapably leads to the conclusion that DR 2–101(A)'s prohibition on "appeals to the emotions, prejudices, or likes or dislikes of a person" is valid.[5]

---

**4.** The Iowa Supreme Court has promulgated extensive rules relating to admission to the bar, Iowa Supreme Court Rules 100–117. These rules set up a procedure for the State Board of Law Examiners to recommend to the Iowa Supreme Court for admission to practice law, "all applicants who pass the examination and who meet the requisite character requirements." Court Rule 100. Additionally, each applicant must demonstrate to the Board of Law Examiners that he or she is "a person of honesty,

integrity, trustworthiness, truthfulness, and one who appreciates and will adhere to the Code of Professional Responsibility." Court Rule 103. Furthermore, the Board of Law Examiners is required to make an "investigation of the moral fitness of any applicant * * *." Court Rule 104.

**5.** Plaintiff suggests that advertising a specific fee for a routine legal service (which is expressly allowed by DR 2–101(C)) is an appeal to the "likes * * * of a person" if the advertised fee is

*Characterizations of Fees*

■ In support of his argument that DR 2–101(A)'s prohibition against "characterizations of his rates or fees" offends the First Amendment, he notes that the advertisement involved in *Bates v. State Bar of Arizona, supra,* stated in bold type: "Legal services at very reasonable fees." He also cites *Dewey v. State Bd. of Dentistry,* 491 F.Supp. 132, 137 (E.D.La.1978), affirmed on the basis of the district court opinion, 625 F.2d 499 (5th Cir. 1980), which held:

> [T]he advertisement contained in Plaintiff's Exhibit No. 3 does not set forth prices, but advertises "economic dental services." However, we are of the opinion that such advertisements do not fall outside the scope of the constitutional protection recognized in *Bates,* supra, merely because they do not contain *price* advertising of routine services.

*Bates* is dispositive of this issue, at least so far as the use of truthful and restrained adjectives is concerned. The Arizona lawyers' use of "very reasonable fees" language was specifically cited by the state bar as misleading; the Court expressly considered the issue, found that the specific rate in question ($175 plus a $20 filing fee for an uncontested divorce) was "very reasonable" and concluded "that the advertisement at issue" was protected by the First Amendment. *Bates v. State Bar of Arizona, supra,* 433 U.S. at 381–82, 97 S.Ct. at 2707–08.

DR 2–101(A), insofar as it prohibits plaintiff's verifiable truthful use of restrained adjectives characterizing his fees, such as "reasonable," "very reasonable," and "moderate," violates his First Amendment right of commercial speech. However, use of unrestrained, hucksterish adjectives, such as "cut-rate," "lowest," "give-away," "below-

cost" and "special," is not protected by the First Amendment, because such adjectives have a high potential to mislead. The Court in *Bates* impliedly suggested that unrestrained advertising by lawyers would be misleading. *Id.* at 372, 97 S.Ct. at 2703.

*Signs and Symbols*

■ In support of his argument that DR 2–101(A)'s prohibition on "the use of all signs and symbols such as, but not limited to, logos, trademarks, graphics, design work, and pictures," plaintiff points out that the advertisement approved by the Supreme Court in *Bates* contained a logo, a scales of justice. *Id.* at 385, 97 S.Ct. at 2710. However, use of the logo does not appear to have been raised as an issue in the *Bates* case, and therefore I do not believe that *Bates* really adjudicated the question.

Signs and symbols, such as logos, do not set forth facts or otherwise inform.[6] They are promotional in nature, and they can be misleading. Therefore, the prohibition against their use in lawyer advertising does not violate plaintiff's First Amendment right of commercial speech. *Central Hudson Gas & Elec. v. Public Service Comm'n, supra,* 447 U.S. at 566, 100 S.Ct. at 2351.

*Race*

■ Plaintiff wishes to communicate to the black portion of the public the fact that his associate is a black. Race is not an item of information that is expressly prohibited by the Disciplinary Rules, but DR 2–101(A) prohibits placing in an ad "any information not hereafter specifically permitted," and the Disciplinary Rules do not specifically permit such information to be placed in an ad.

---

substantially below the prevailing fee charged in the community. Because there is no evidence that the defendants so interpret the prohibition on appeals to the "likes * * * of a person," this tenuous contention merits no further consideration. If defendants ever try to discipline plaintiff for appealing to the "likes * * * of a person" because he advertises a specific fee substantially below the prevailing fee charged in the community, plaintiff may

then litigate the constitutionality of such an interpretation by defendants.

**6.** A photograph of a lawyer would usually accurately inform the viewer about his race, but under the holding of this court the lawyer may place that information in an advertisement. *See* section entitled *Race, infra.* A photograph of a person may be very misleading in other respects.

Race is a factual matter, not promotional, and therefore such information cannot be misleading. Defendants do not articulate any governmental interest in prohibiting inclusion of such information in a lawyer's advertisements, and the court can perceive none. Indeed, such information can serve a useful purpose. Many persons, especially many in the segment of the public to which lawyer advertising is primarily directed, are apprehensive about going to a lawyer and prefer, as a means of somewhat allaying their apprehensions, to seek out a lawyer with whom they can identify. (This court has encountered black litigants in need of court appointed counsel who felt that they could effectively communicate with and trust only a black lawyer.)

The Disciplinary Rules, insofar as they prohibit plaintiff from mentioning his or his associate's race in advertisements, violate plaintiff's First Amendment right of commercial speech.[7]

### Expression of Views

█ Plaintiff wishes to express in his advertisements his views on topics such as the role and responsibility of the legal profession, the delivery of legal services to people with moderate or low incomes and, in the words of his brief, "a whole host or variety of other subjects directly related to the delivery of legal service." Expression of views is not expressly prohibited by the Disciplinary Rules, but, as previously noted, DR 2–101(A) prohibits placing in an ad "any information not hereafter specifically permitted," and the Disciplinary Rules do not specifically permit expression of views to be placed in an ad.

Of course, there is no question that plaintiff has a First Amendment right to express his views. He may express his views in a variety of ways including, perhaps, by means of a written insertion enclosed with the bills for services he sends to clients. *See Consolidated Edison Co. v. Public Service Comm'n,* 447 U.S. 530, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980). However, the ques-

tion before the court is, does he have a First Amendment right to express his views in the context of his commercial advertising?

Views of an advertiser expressed in the context of commercial advertising necessarily become a part of the advertising. Views are subjective opinions, not statements of verifiable fact. In the context of commercial advertising they are promotional content with substantial potential to mislead and to appeal to emotions, prejudices, or likes or dislikes of a person. Therefore, expression of views in the context of a lawyer's commercial advertising is not commercial speech falling within the ambit of First Amendment protection. *Central Hudson Gas & Elec. Corp. v. Public Service Comm'n, supra,* 447 U.S. at 566, 100 S.Ct. at 2351.

### Legal Clinic

DR 2–101(F) prohibits a lawyer from using in his advertising

the term "clinic" or any similar term * * unless the practice of the lawyer or his firm is limited to routine matters for which costs of rendering the service can be substantially reduced because of the repetitive nature of the services performed and the use of standardized forms and office procedures.

Plaintiff challenges this limitation on use of the term "clinic," and contends that a lawyer primarily or substantially engaged in the delivery of routine legal services should be allowed to use the term "clinic" or "any similar term."

The advertisement in question in *Bates v. State Bar of Arizona, supra,* identified the advertiser as "Legal Clinic of Bates & O'Steen." The State Bar of Arizona argued that the advertisement was misleading because "legal clinic" is an allegedly undefined term. The Court found this contention unpersuasive, stating: "We suspect that the public would readily understand the term 'legal clinic'—if, indeed, it focused on the term at all—to refer to an operation like that of appellants' that is geared to

---

**7.** Plaintiff raises only the matter of race. Therefore, the court need not decide whether the failure of the Disciplinary Rules to permit

an advertising lawyer to mention his or her sex, religion, ethnic identity and other personal facts is also violative of the First Amendment.

provide standardized and multiple services." *Bates v. State Bar of Arizona, supra,* 433 U.S. at 381, 97 S.Ct. at 2708. However, Bates and O'Steen, in order to provide legal services at modest fees to persons of moderate income,

> would accept only routine matters, such as uncontested divorces, uncontested adoptions, simple personal bankruptcies, and changes of name, for which costs could be kept down by extensive use of paralegals, automatic typewriting equipment, and standardized forms and office procedures. More complicated cases, such as contested divorces, would not be accepted.

*Id.* at 354, 97 S.Ct. at 2694.

■ DR 2–101(F)'s limitation of use of the term "clinic" to a law office limiting its services to routine matters, like that of Bates and O'Steen, is valid. Use of the term "clinic" by any law office not so limited would be misleading to the public, which would expect a "clinic" to provide *only* the routine services and *thereby* keep costs below that of other law offices through volume processing of the services by use of paralegals, automatic typewriting equipment, standardized forms, etc. The state clearly has an interest in preventing the public from being told that any particular law office is a "clinic" unless that law office is in fact nothing more or less than a clinic. DR 2–101(F)'s "clinic" definition is valid.

### Fields of Specialty

Plaintiff states in his brief:

> Dr 2–101(B)(2), when read in conjunction with Dr 2–105(2), makes it clear that a lawyer may advertise fields of practice, limitation of practice, or specialization, on his or her professional card, letterhead, professional announcement, classified section of the telephone directory, newspaper, and periodicals and legal directories, as otherwise allowed in DR 2–102(A) and DR 2–102(D). However, a lawyer may not advertise fields of practice, limitation of practice, or specialization, on television or radio.

■ I do not agree that radio or television advertisements of fields of practice, etc. are prohibited, and defendants do not suggest that they are. DR 2–101(B) permits radio and television advertising of specific information, including: "(2) Fields of practice, limitation of practice or specialization, but only to the extent permitted by DR 2–105." I understand the "extent permitted by DR 2–105" language to be a reference only to the *content* limits prescribed in DR 2–105. The absence of reference in DR 2–105 to radio and television does not nullify the express grant of DR 2–101(B) to advertise on radio and television all enumerated information, including fields of practice, etc. The lack of mention of radio and television in DR 2–105 appears to be the result of oversight.[8] There is therefore no "fields of specialty" issue to resolve.

### Radio and Television Content Limitations

■ DR 2–101(B) and (C) provide that permitted information

> in words and numbers only, articulated only by a single nondramatic voice, not that of the lawyer, and with no other background sound, may be communicated by radio. The same information, in words and numbers only, articulated by a single nondramatic voice, not that of the lawyer, and with no other background sound, may be communicated on television. In the case of television, no visual display shall be allowed except that allowed in print as articulated by the announcer.

Plaintiff argues that he has a First Amendment right in radio and television advertising to use conversations between two or more persons, such as an attorney-client conversation; to personally speak and appear; to use a dramatic voice; to use background sounds, such as sirens, office

---

8. Before May 6, 1980, the Disciplinary Rules did not permit radio and television advertisements by lawyers. An order entered by the Supreme Court of Iowa on May 6, 1980, amended DR 2–101(B) and (C) to allow lawyer advertising on radio and television. The order did not amend DR 2–105 to mention radio and television, an apparent oversight.

typewriters, and opening and closing of file cabinets, and to generally use dramatics. In respect to television, he also contends he has a First Amendment right to use visual displays and dramatics. As an example, he would like to use a television ad showing a layman and lawyer conversing—the layman would tell the lawyer that he does his own electrical work and drafts his own will, and then, as the lights flicker, the lawyer would explain to the layman why he should have a lawyer draft his will. He also wants to communicate the race of his black associate by having him appear in television ads.

In *Bates v. State Bar of Arizona, supra,* 433 U.S. at 384, 97 S.Ct. at 2709, the Court stated:

> As with other varieties of speech, it follows as well that there may be reasonable restrictions on the time, place, and manner of advertising. *See Virginia Pharmacy Board v. Virginia Consumer Council,* 425 U.S., at 771 [96 S.Ct. at 1830]. * * * And the special problems of advertising on the electronic broadcast media will warrant special consideration. Cf. *Capital Broadcasting Co. v. Mitchell,* 333 F.Supp. 582 (D.C.1971), summarily aff'd *sub nom. Capital Broadcasting Co. v. Acting Attorney General,* 405 U.S. 1000 [92 S.Ct. 1289, 31 L.Ed.2d 472] (1972).

The court need not exhaustively explore the unique nature of electronic media advertising and the court decisions that have touched on the subject, as does defendants' lengthy brief. The following few observations are sufficient.

It is the holding of this court under the section entitled *Race, supra,* that plaintiff has a First Amendment right to disclose in his advertising words the race of his associate. Thus he need not put the physical image of his associate on the television screen in order to disclose his race.

Everything else plaintiff wishes to do on radio and television that is prohibited by the Disciplinary Rules is promotional, not informational, in nature. Promotional content of commercial speech is potentially de-ceptive or misleading, and therefore it is not protected by the First Amendment. *Central Hudson Gas & Elec. Corp. v. Public Service Comm'n, supra,* 447 U.S. at 566, 100 S.Ct. at 2351. The Disciplinary Rules' limitations on radio and television advertising are valid.

## PLAINTIFF'S CHALLENGES TO MEANS LIMITATIONS

■ DR 2–101(B) limits lawyer advertising to

> newspapers or periodicals of general circulation in the geographic area in which the lawyer maintains offices or in which a significant part of the lawyer's clientele resides or in the classified advertising section of the telephone directory distributed in the geographic area in which the lawyer maintains offices or in which a significant part of the lawyer's clientele resides or in reputable legal directories generally available in such area[,] [9]

and to

> radio and television, to the extent possible, * * * only in the geographic area in which the lawyer maintains offices or in which a significant part of the lawyer's clientele resides.

Plaintiff asserts a First Amendment right to advertise in publications other than newspapers or periodicals of general circulation, such as trade journals, in-house newspapers, newsletters and university or campus newspapers, and to advertise by using leaflets, flyers, billboards, telephone book covers, and direct mailings to people targeted as probably needing a specific legal service. He also challenges the geographic restrictions of DR 2–101(B).

The state, of course, may place "reasonable restrictions on the time, place and manner of advertising." *Bates v. State Bar of Arizona, supra,* 433 U.S. at 384, 97 S.Ct. at 2709. The question therefore is, are the restrictions reasonable?

---

**9.** DR 2–101(C), which governs *fee* information, requires that the newspapers or periodicals be published at least once each month. This monthly publication requirement is not in issue.

### Other Publications

Defendants offer the court no reason for not permitting a lawyer to advertise in publications other than newspapers or periodicals of general circulation, other than suggesting that because advertisements in publications of more limited circulation may be targeted for a select group whose numbers generally are few, the potential for abuse is high. They do not elucidate their abuse potential theory, and the court is unable to do so.

The defendants have not shown that there is any governmental interest served by prohibiting lawyer advertisements in publications other than newspapers and periodicals of general circulation, and such prohibition offends plaintiff's First Amendment right of commercial speech.

### Flyers, Leaflets, Billboards and Telephone Book Covers

The Disciplinary Rules consistently require that permitted advertising be in a "dignified" manner or form. DR 2–101(B); DR 2–101(C); DR 2–101(H); DR 2–102(A).

The Supreme Court of Iowa no doubt considered lawyer advertising by flyers, leaflets, billboards and phone book covers to be unsuitable for several reasons, including preservation of professionalism, of which dignity is certainly a part. These means of advertising may be suitable for trying to sell many products and some services, but they would be a most undignified means for a lawyer to use in advertising.

Although considerations of professionalism do not justify entirely banning commercial advertising by lawyers, *see Bates v. State Bar of Arizona, supra*, 433 U.S. at 368–72, 97 S.Ct. at 2701–03, such considerations may certainly play a valid role in regulating the manner of advertising. The state has an interest in "minimizing commercialization of the legal profession." *In re Primus*, 436 U.S. 412, 436–37, 98 S.Ct. 1893, 1906–07, 56 L.Ed.2d 417 (1978). *See also Ohralik v. Ohio State Bar Ass'n, supra*, 436 U.S. at 460–61, 98 S.Ct. at 1920–21;

*Bates v. State Bar of Arizona, supra*, 433 U.S. at 368, 97 S.Ct. at 2701.

The court is satisfied that the state's interest in minimizing commercialization of the legal profession justifies the state in prohibiting lawyer advertising by means of flyers, leaflets, billboards and telephone book covers, especially in view of the fact that there are available "ample alternative channels for communication of the information." *Virginia Pharmacy Bd. v. Virginia Consumer Council, supra*, 425 U.S. at 771, 96 S.Ct. at 1830.

### Direct Mailing

The Disciplinary Rules do not authorize a lawyer to advertise by direct mailing, a prohibition struck down as violative of the First Amendment by the Supreme Court of Kentucky and the Court of Appeals of New York. *Kentucky Bar Ass'n v. Stuart*, 568 S.W.2d 933 (Ky.1978); *Koffler v. Joint Bar Ass'n*, 51 N.Y.2d 140, 432 N.Y.S.2d 872, 412 N.E.2d 927 (1980), *cert. denied*, 450 U.S. 1026, 101 S.Ct. 1733, 68 L.Ed.2d 221 (1981). *See Matter of R.M.J.*, 609 S.W.2d 411, 416 (Mo.1981) (Seiler, J., dissenting.)

Both the Kentucky court and the New York court concluded that direct mailing to target groups of advertising material did not constitute solicitation prohibited by DR 2–103.[10] *Ohralik v. Ohio State Bar Ass'n, supra*, which held that the First Amendment does not preclude the discipline of a lawyer for soliciting clients in person for pecuniary gain under circumstances posing dangers that the state has a right to prevent, was distinguished on the ground that Mr. Ohralik made blatant in-person solicitations of the prospective clients, one in traction in the hospital and the other just released from the hospital.

The New York court observed:

To outlaw the use of letters, the content of which does not violate DR 2–101, addressed to those most likely to be in need of legal services, because in addition to "advertising" the nature of the service

---

**10.** DR 2–103(A) provides: "A lawyer shall not, except as authorized in DR 2–101, recommend employment, as a private practitioner, of himself, his partner, or associate or [sic] a non-lawyer who has not sought his advice regarding employment of a lawyer."

and its price the letters implicitly or explicitly suggest employment of the writer to perform those services, ignores the strong societal and individual interest in the free dissemination of truthful price information as a means of assuring informed and reliable decision making in our free enterprise system, about which both the Supreme Court (*Bates v. State Bar of Ariz.*, 433 U.S. 350, 364, 97 S.Ct. 2691, 2699, 53 L.Ed.2d 810 *supra*) and we (*People v. Mobil Oil Corp.*, 48 N.Y.2d 192, 200, 422 N.Y.S.2d 33, 397 N.E.2d 724, *supra*) have had occasion to comment, and can only be productive of confusion for the profession (see Freedman, Lawyers' Ethics in an Adversary System, ch. 10). To do so, moreover, is to suggest that there is necessarily something improper about an attorney's desire to earn a fee, and that there is something different about the legal profession that makes direct mail advertising improper though it would not be for other businesses or professions and though indirect forms of advertising are not improper even for the legal profession * * *.

*Koffler v. Joint Bar Ass'n, supra*, 412 N.E.2d at 931.

Defendants do not specifically identify the governmental interests sought to be protected by prohibition of direct mail advertising, but this court assumes that they are the same as those asserted in the *Koffler* case—"potentials for deception, for invasion of privacy, for overcommercialization of the profession and for conflict of interest." *Id.* 412 N.E.2d at 933 (footnote omitted). These interests must be scrutinized under the last three parts of the four-part analysis articulated in *Central Hudson Gas & Elec. Corp. v. Public Service Comm'n, supra*, 447 U.S. at 566, 100 S.Ct. at 2351. Are the asserted governmental interests substantial? Does prohibition of direct mail advertising directly advance the governmental interests asserted? Is prohibition of direct mail advertising more extensive than is necessary to serve those interests?

"*Bates, Ohralik* and *Primus* establish that these are legitimate and important State interests." *Koffler v. Joint Bar Ass'n, supra*, 412 N.E.2d at 932.

There is, however, obvious tension between these interests and the societal interest, already noted, in the free dissemination of truthful price information in order to assure "informed and reliable decisionmaking" (*Bates*, 433 U.S. 350, 364, 97 S.Ct. 2691, 2699, 53 L.Ed.2d 810 *supra*). It is in the light of that tension that the directness of relation of regulation to purpose is to be considered. *Id.*

*Conflict of interest*: There is no suggestion by defendants in this case, nor was there a suggestion by the defendant in *Koffler*, as to how a conflict of interest could arise by direct mail advertising. *Id.* 412 N.E.2d at 933. The court can think of none. Thus the prohibition on direct mail advertising does not prevent potential for conflict of interest.

*Overcommercialization*: Unrestrained content of direct mail advertising could constitute overcommercialization, and the governmental interest in preventing potential overcommercialization would be served by prohibiting direct mail advertising. However, prohibition is a far more extensive remedy than is necessary—the Disciplinary Rules' restrictions on advertising content adequately preclude overcommercialization. *Id.*

*Invasion of privacy*: "Invasion of privacy and the possibility of overbearing persuasion, both of which were condemned in *Ohralik* and which could conceivably be present in telephone solicitation * * * are not sufficiently possible in mail solicitation to justify banning it." *Id.* This court is sensitive to the fact that in the average home some anxiety might be generated by the arrival in the mail of an envelope from a lawyer's office. Prohibition of direct mailing would prevent such feelings of anxiety as might be experienced before opening the envelope and discovering that its content is merely advertising. However, prohibition is far more extensive than necessary—a requirement that there be printed or stamped on the face of the envelope the

**1232**

words "Advertising Content" would suffice.[11]

*Deception*: The words of the Court of Appeals of New York are again apropos:

The potential for deception is a different matter, for unlike newspaper, television or radio advertising, direct mail goes only to the addressee. The temptation for deception is, therefore, greater, and the probability of exposure less, than for those more public media. Enforcement of the State's strong interest that "the stream of commercial information flow cleanly as well as freely" (*Virginia Pharmacy Bd. v. Virginia Consumer Council*, 425 U.S. 748, 772, 96 S.Ct. 1817, 1831, 48 L.Ed.2d 346) and that, to that end, there be effective oversight of members of the Bar is less probable, therefore, with respect to mail than to media advertising (see *Ohralik*, 436 U.S. 447, 466–467, 98 S.Ct. 1912, 1924–1925, 56 L.Ed.2d 444, *supra; Allison v. Louisiana State Bar Assn.*, 362 So.2d 489, 496 [La.]).

That there is a substantial State interest to which the regulations are closely related does not end the inquiry, however, for complete suppression is not constitutional if the State's interest can be adequately protected by more limited regulation. That it can be seems hardly open to question, in view, for example, of the filing requirement for retainer statements now contained in the Appellate Division's rule 691.20 (22 NYCRR 691.20). That similar filing of a solicitation letter assures the public ample protection was the conclusion of the Supreme Court of Kentucky (*Kentucky Bar Assn. v. Stuart*, 568 S.W.2d 933, 934 [Ky.], *supra* ).

*Id.* (Footnote omitted.)

The Supreme Court of Kentucky concluded its opinion by stating: "Ample protection may be assured the public by promulgation of a rule which requires the attorney to mail a copy of such advertisements to the Association simultaneously with the mailing of one or more of them to members of the public." *Kentucky Bar Ass'n v. Stuart, su-*

pra, 568 S.W.2d at 934. Defendants could do the same.[12]

The Disciplinary Rules, insofar as they prohibit plaintiff from using direct mailing as a means of advertising, violate plaintiff's First Amendment right of commercial speech.

### Geography

The court finds plaintiff's First Amendment challenge to the geographic limitations to be without merit. Those limitations are clearly "reasonable restrictions on the * * * place * * * of advertising." *Bates v. State Bar of Arizona, supra*, 433 U.S. at 384, 97 S.Ct. at 2709.

### VAGUENESS CHALLENGE

■ Plaintiff challenges the Disciplinary Rules' requirement that lawyer advertising be in a "dignified" manner or form as unconstitutionally vague. The court does not agree. The word, in the context used, clearly denotes restraint. A lawyer should have little difficulty distinguishing a dignified advertisement from one that is undignified.

### JUDGMENT AND INJUNCTION

IT IS THE JUDGMENT of the court that The Disciplinary Rules of the Iowa Code of Professional Responsibility for Lawyers limiting the means and content of lawyer advertising violate plaintiff's First Amendment right of commercial speech insofar as they prohibit:

(1) Characterization of his rates or fees by verifiable truthful use of restrained adjectives such as "reasonable," "very reasonable," and "moderate."

(2) Identification by words of his race or his associate's race.

(3) Advertising in publications other than newspapers and periodicals of general circulation.

(4) Direct mailing of permissible advertising material.

---

11. This observation is, of course, by way of example and not by way of prescription.

12. *See* footnote 11, *supra*.

IT IS THE FURTHER JUDGMENT of the court that in all other respects The Disciplinary Rules of the Iowa Code of Professional Responsibility for Lawyers limiting the means and content of lawyer advertising do not violate plaintiff's First Amendment right of commercial speech.

IT IS ORDERED that defendants are hereby enjoined from enforcing the portions of The Disciplinary Rules of the Iowa Code of Professional Responsibility for Lawyers limiting the means and content of lawyer advertising that have herein been adjudicated to be violative of plaintiff's First Amendment right of commercial speech.

## STAY

IT IS ORDERED that the injunction hereinabove ordered be stayed until time for appeal has expired and during the pendency of an appeal if one is taken.

## ATTORNEYS FEES

The court retains jurisdiction to entertain an application for attorney fees under 42 U.S.C. § 1988.

## APPENDIX

## CODE OF PROFESSIONAL RESPONSIBILITY

## DISCIPLINARY RULES

DR 2–101 Publicity.

(A) A lawyer shall not, on behalf of himself, his partner, associate or any other lawyer affiliated with him or his firm, use, or participate in the use of, any form of public communication which contains a false, fraudulent, misleading, deceptive, self-laudatory or unfair statement, which contains any statement or claim relating to the quality of his legal services, which appeals to the emotions, prejudices, or likes or dislikes of a person, or which contains any claim that is not verifiable; nor shall he use or participate in the use of any form of public communication, calculated to attract clients, which contains any information not hereafter specifically permitted. In all communications under DR 2–101 and DR 2–102 the lawyer shall avoid all subjective characterizations of his rates or fees, such as, but not limited to, "cut-rate," "lowest," "reasonable," "moderate," "very reasonable," "giveaway," "below-cost," "special"; and shall further avoid the use of all signs and symbols such as, but not limited to, logos, trademarks, graphics, design work, and pictures.

Referred to in DR 2–101(I), DR 2–102

(B) The following information, in words and numbers only, may be communicated to the public in newspapers or periodicals of general circulation in the geographic area in which the lawyer maintains offices or in which a significant part of the lawyer's clientele resides or in the classified advertising section of the telephone directory distributed in the geographic area in which the lawyer maintains offices or in which a significant part of the lawyer's clientele resides or in reputable legal directories generally available in such area. The same information, in words and numbers only, articulated only by a single nondramatic voice, not that of the lawyer, and with no other background sound, may be communicated by radio. The same information, in words and numbers only, articulated by a single nondramatic voice, not that of the lawyer, and with no other background sound, may be communicated on television. In the case of television, no visual display shall be allowed except that allowed in print as articulated by the announcer. All such communications on radio and television, to the extent possible, shall be made only in the geographic area in which the lawyer maintains offices or in which a significant part of the lawyer's clientele resides. Any such information shall be presented in a dignified manner:

(1) Name, including name of law firm and names of professional associates, addresses and telephone numbers and the designation "lawyer", "attorney", "law firm" or the like;

(2) Fields of practice, limitation of practice or specialization, but only to the extent permitted by DR 2–105;

(3) Date and place of birth;

(4) Date and place of admission to the bar of state and federal courts;

(5) Schools attended, with dates of graduation, degrees and other scholastic distinctions;

(6) Public or quasi-public offices;

(7) Military service;

(8) Legal authorships;

(9) Legal teaching position;

(10) Memberships, offices and committee assignments in bar associations;

(11) Membership and offices in legal fraternities and legal societies;

(12) Technical and professional licenses;

(13) Memberships in scientific, technical and professional associations and societies;

(14) Foreign language ability;

(15) Names and addresses of bank references;

(16) With their written consent, names of clients regularly represented;

(17) Subject to DR 2–103, prepaid or group legal services programs in which the lawyer participates;

(18) Whether credit cards or other credit arrangements are accepted;

(19) Office and telephone answering service hours.

Nothing contained herein shall prohibit a lawyer from permitting the inclusion in reputable law lists and law directories intended primarily for the use of the legal profession of such information as traditionally has been included in these publications.

Referred to in DR 2–101(H), DR 2–105

(C) The following fee information, in words and numbers only, may be communicated to the public in newspapers or periodicals of general circulation which are published at least once each month and which are distributed in the geographic area in which the lawyer maintains offices or in which a significant part of the lawyer's clientele resides or in the classified section of the telephone directory distributed in the geographic area in which the lawyer maintains offices or in which a significant part of the lawyer's clientele resides. The same information in words and numbers only, articulated only by a single nondramatic voice, not that of the lawyer, and with no

other background sound may be communicated by radio. The same information, in words and numbers only, articulated by a single nondramatic voice, not that of the lawyer, and with no other background sound may be communicated on television. In the case of television, no visual display shall be allowed except that which is allowed in print as articulated by the announcer. All such communications on radio and television, to the extent possible, shall be made only in the geographic area in which the lawyer maintains offices or in which a significant part of the lawyer's clientele resides. Any such information shall be presented in a dignified manner:

(1) Fee for an initial consultation;

(2) Availability upon request of either a written schedule of fees or an estimate of the fee to be charged for specific services, or both;

(3) Contingent fee rates subject to DR 2–106(C), provided that the statement discloses whether percentages are computed before or after deduction of costs;

(4) Fixed fees or range of fees for specific legal services or hourly fee rates provided that, in print size at least equivalent to the largest print used in setting forth the fee information, the statement discloses:

(a) that the stated fixed fees or range of fees will be available only to clients whose matters are encompassed within the described services, and

(b) if the client's matters are not encompassed within the described services, or if an hourly fee rate is stated, the client is entitled, without obligation, to a specific written estimate of the fees likely to be charged.

(D) For purposes of this rule, the term "specific legal services" shall be limited to the following services:

(1) Abstract examinations and title opinions not including services in clearing title;

(2) Uncontested dissolutions of marriage involving no disagreement concerning custody of children, alimony,

child support or property settlement [see DR 5-105(A)];

(3) Wills leaving all property outright to one beneficiary and contingently to one beneficiary or one class of beneficiaries;

(4) Income tax returns for wage earners;

(5) Uncontested personal bankruptcies;

(6) Changes of name;

(7) Simple residential deeds;

(8) Residential purchase and sale agreements;

(9) Residential leases;

(10) Residential mortgages and notes;

(11) Powers of attorney;

(12) Bills of sale.

The committee on professional ethics and conduct of the Iowa State Bar Association, acting as commissioners of the supreme court as provided by court rule 118, on its own motion or upon the request of a lawyer admitted to practice in this state, shall, from time to time, consider and recommend to the court proposed amendments to the Code, expanding or constricting the above list of "specific legal services". In considering such amendments the committee shall apply the following criteria which have guided the supreme court in determining which services should be included in the above list:

(1) The description of the service would not be misunderstood by the average layperson or be misleading or deceptive;

(2) Substantially all of the service normally can be performed in the lawyer's office with the aid of standardized forms and office procedures;

(3) The service does not normally involve a substantial amount of legal research, drafting of unique documents, investigation, court appearances or negotiation with other parties or their attorneys; and

(4) Competent performance of the service normally does not depend upon ascertainment and consideration of more than a few varying factual circumstances.

The committee shall adopt regulations, subject to the approval of the supreme court, to provide a procedure to receive and consider such requests from lawyers, and for the prompt submission to this court of any appeal from a determination adverse to such request. Said committee may further issue, subject to the approval of the supreme court, regulations further defining or describing "specific legal services" within the meaning of this rule.

(E) Unless otherwise specified in the public communication concerning fees, the lawyer shall be bound, in the case of fee advertising in the classified section of the telephone directory, for a period of at least the time between printings of the directory in which the fee advertisement appears and in the case of all other fee advertising for a period of at least ninety days thereafter, to render the stated legal service for the fee stated in the communication unless the client's matters do not fall into the described services. In that event or if a range of fees is stated, he shall render the service for the estimated fee given the client in advance of rendering the service.

(F) A lawyer shall not, on behalf of himself, his partners, associates or any other lawyer affiliated with him or his firm, use the public communication of fee information concerning specific legal services as an indirect means of attracting clients for whom he performs other legal services not related to the specific legal services publicized; nor may the term "clinic" or any similar term be used in any communication to the public unless the practice of the lawyer or his firm is limited to routine matters for which costs of rendering the service can be substantially reduced because of the repetitive nature of the services performed and the use of standardized forms and office procedures. Whether or not it contains fee information, a lawyer shall preserve in his office a copy of each advertisement placed in a newspaper, the classified section of the telephone directory, or periodical and a tape of the radio or television commercial or recording for at least three years and a record of the date or dates and name of the publication in which

it appeared or the name of the station upon which it was aired.

(G) A lawyer recommended by, paid by or whose legal services are furnished by, a qualified legal assistance organization may authorize or permit or assist such organization to use means of dignified commercial publicity, which does not identify any lawyer by name, to describe the availability or nature of its legal services or legal service benefits.

(H) This rule does not prohibit limited and dignified identification of a lawyer as a lawyer as well as by name:

(1) In political advertisements when his professional status is germane to the political campaign or to a political issue;

(2) In public notices when the name and profession of a lawyer are required or authorized by law or are reasonably pertinent for a purpose other than the attraction of potential clients;

(3) In routine reports and announcements of a bona fide business, civic, professional, or political organization in which he serves as a director or officer;

(4) In and on legal documents prepared by him;

(5) In and on legal textbooks, treatises, and other legal publications, and in dignified advertisements thereof; and

(6) In communications by a qualified legal assistance organization, along with the biographical information permitted under DR 2–101(B), directed to a member or beneficiary of such organization.

(I) A lawyer shall not compensate or give anything of value to representatives of the press, radio, television or other communication medium in anticipation of or in return for professional publicity in a news item nor voluntarily give any information to such representatives which, if published in a news item, would be in violation of DR 2–101(A). [Court Order February 28, 1977; February 17, 1978; July 24, 1979; May 6, 1980]

Referred to in DR 2–103

Referred to in Professional Ethics and Conduct Committee rules 5.1, 5.6

Referred to in "Definitions" at the end hereof

DR 2–102 Professional Notices, Letterheads, Offices and Signs

(A) A lawyer or law firm shall not use professional cards, signs, letterheads, or similar professional notices or devices, except that the following may be used if they are in dignified form:

(1) A professional card of a lawyer identifying him by name and as a lawyer, and giving his addresses, telephone numbers, the name of his law firm, and any information permitted under DR 2–105. A professional card of a law firm may also give the names of members and associates. Such cards may be used for identification.

(2) A brief professional announcement card stating new or changed associations or addresses, change of firm name, or similar matters pertaining to the professional office of a lawyer or law firm, which may be mailed to lawyers, clients, former clients, personal friends, and relatives. It shall not state biographical data except to the extent reasonably necessary to identify the lawyer or to explain the change in his association, but it may state the immediate past position of the lawyer. It may give the names and dates of predecessor firms in a continuing line of succession. It shall not state the nature of the practice except as permitted under DR 2–105.

(3) A sign on or near the door of the office and in the building directory identifying the law office. The sign shall not state the nature of the practice, except as permitted under DR 2–105.

(4) A letterhead of a lawyer identifying him by name and as a lawyer, and giving his addresses, telephone numbers, the name of his law firm, associates and any information permitted under DR 2–105. A letterhead of a

law firm may also give the names of members and associates, and names and dates related to deceased and retired members. A lawyer may be designated "Of Counsel" on a letterhead if he has a continuing relationship with a lawyer or law firm, other than as a partner or associate. A lawyer or law firm may be designated as "General Counsel" or by similar professional reference on stationery of a client if he or the firm devotes a substantial amount of professional time in the representation of that client. The letterhead of a law firm may give the names and dates of predecessor firms in a continuing line of succession.

(5) An alphabetical listing of the office of a lawyer or law firm in the alphabetical section and classified section of the telephone directory or directories for the geographical area or areas in which the lawyer resides or maintains offices or in which a significant part of his clientele resides and in the city directory of the city in which the lawyer's or the firm's office is located may be in the usual boldface type permitted by the publisher. A law firm may have a listing in the firm name which also lists the names and individual telephone numbers, if any, of its members and associates. With respect to listings in compliance with DR 2–105, one disclaimer per page, prominently displayed, shall be adequate. Nothing in this subparagraph (5) prohibits advertising permitted by DR 2–101.

Referred to in DR 2–105

(B) A lawyer in private practice shall not practice under a trade name, a name that is misleading as to the identity of the lawyer or lawyers practicing under such name, or a firm name containing names other than those of one or more of the lawyers in the firm, except that the name of a professional corporation or professional association may contain "P.C." or "P.A." or similar symbols indicating the nature of the organization, and if otherwise lawful a firm may use as, or continue to include in, its name, the name or names of one or more deceased or retired members of the firm or of a predecessor firm in a continuing line of succession. A lawyer who assumes a judicial, legislative, or public executive or administrative post or office shall not permit his name to remain in the name of a law firm or to be used in professional notices of the firm during any significant period in which he is not actively and regularly practicing law as a member of the firm, and during such period other members of the firm shall not use his name in the firm name or in professional notices of the firm.

(C) A lawyer shall not hold himself out as having a partnership with one or more other lawyers unless they are in fact partners.

(D) A partnership shall not be formed or continued between or among lawyers licensed in different jurisdictions unless all enumerations of the members and associates of the firm on its letterhead and in other permissible public communications and listings make clear the jurisdictional limitations on those members and associates of the firm not licensed to practice in all listed jurisdictions; however, the same firm name may be used in each jurisdiction.

(E) A lawyer who is engaged both in the practice of law and another profession or business shall not so indicate on his letterhead, office sign, or professional card, nor shall he identify himself as a lawyer in any publication in connection with his other profession or business.

(F) The text of a lawyer's letterhead, office sign, professional card or other authorized notice or listing shall not violate the provisions of DR 2–101(A). [Court Order February 17, 1978; May 6, 1980; August 12, 1980]

Referred to in DR 2–101

DR 2–103 Recommendation of Professional Employment.

(A) A lawyer shall not, except as authorized in DR 2–101, recommend employment, as a private practitioner, of himself, his partner, or associate or a nonlawyer who has not sought his advice regarding employment of a lawyer.

(B) A lawyer shall not compensate or give anything of value to a person or organization to recommend or secure his employment by a client, or as a reward for having made a recommendation resulting in his employment by a client, except that he may pay the usual and reasonable fees or dues charged by any of the organizations listed in DR 2–103(D).

(C) A lawyer shall not request a person or organization to recommend or promote the use of his services or those of his partner or associate, or any other lawyer affiliated with him or his firm, as a private practitioner, except as authorized in DR 2–101, and except that:

(1) He may request referrals from a lawyer referral service operated, sponsored, or approved by the bar association and may pay its fees incident thereto.

(2) He may co-operate with the legal service activities of any of the offices or organizations enumerated in DR 2–103(D)(1) through (4) and may perform legal services for those to whom he was recommended by it to do such work if:

(a) The person to whom the recommendation is made is a member or beneficiary of such office or organization; and

(b) The lawyer remains free to exercise his independent professional judgment on behalf of his client.

(D) A lawyer shall not knowingly assist a person or organization that furnishes or pays for legal services to others to promote the use of his services or those of his partner or associate or any other lawyer affiliated with him or his firm, except as permitted in DR 2–101. However, this does not prohibit a lawyer or his partner or associate or any other lawyer affiliated with him or his firm from being recommended, employed or paid by, or co-operating with, one of the following offices or organizations that promote the use of his services or those of his partner or associate or any other lawyer affiliated with him or his firm if there is no interference with the exercise of independent professional judgment on behalf of his client:

(1) A legal aid office or public defender office:

(a) Operated or sponsored by a duly accredited law school.

(b) Operated or sponsored by a bona fide nonprofit community organization.

(c) Operated or sponsored by a governmental agency.

(d) Operated, sponsored, or approved by a bar association.

(2) A military legal assistance office.

(3) A lawyer referral service operated, sponsored or approved by a bar association.

(4) Any bona fide organization that recommends, furnishes or pays for legal services to its members or its beneficiaries provided the following conditions are satisfied:

(a) Such organization, including any affiliate is so organized and operated that no profit is derived by it from the rendition of legal services by lawyers, and that, if the organization is organized for profit, the legal services are not rendered by lawyers employed, directed, supervised or selected by it except in connection with matters where such organization bears ultimate liability of its member or beneficiary.

(b) Neither the lawyer, nor his partner, nor associate, nor any other lawyer affiliated with him or his firm, nor any nonlawyer, shall have initiated or promoted such organization for the primary purpose of providing financial or other benefit to such lawyer, partner, associate or affiliated lawyer.

(c) Such organization is not operated for the purpose of procuring legal work or financial benefit for any lawyer as a private practitioner outside of the legal services program of the organization.

(d) The member or beneficiary to whom the legal services are furnished, and not such organization, is recognized as the client of the lawyer in the matter.

(e) Any member or beneficiary who is entitled to have legal services furnished or paid for by the organization may, if such member or beneficiary so desires, and at his own expense, select counsel other than that furnished, selected or approved by the organization for the particular matter involved.

(f) The legal service plan of such organization provides appropriate relief for any member or beneficiary who asserts a claim that the representation by counsel furnished, selected or approved would be unethical, improper or inadequate under the circumstances of the matter involved and the plan provides an appropriate procedure for seeking such relief.

(g) The lawyer does not know or have cause to know that such organization is in violation of applicable laws, rules of court and other legal requirements that govern its legal service operations.

(h) Such organization has filed with the client security and attorney disciplinary commission at least annually a report with respect to its legal service plan, if any, showing its terms, its schedule of benefits, its subscription charges, agreements with counsel, and financial results of its legal service activities or, if it has failed to do so, the lawyer does not know or have cause to know of such failure.

Referred to in DR 2–103(B), DR 2–104

(E) A lawyer shall not accept employment when he knows or it is obvious that the person who seeks his services does so as a result of conduct prohibited under this disciplinary rule. [Court Order February 28, 1977; February 17, 1978]

Referred to in DR 2–101

**DR 2–104 Suggestion of Need of Legal Services.**

(A) A lawyer who has given in-person unsolicited advice to a lay person that he should obtain counsel or take legal action shall not accept employment resulting from that advice, except that:

(1) A lawyer may accept employment by a close friend, relative, former client (if the advice is germane to the for-

mer employment), or one whom the lawyer reasonably believes to be a client.

(2) A lawyer may accept employment that results from his participation in activities designed to educate lay persons to recognize legal problems, to make intelligent selection of counsel, or to utilize available legal services if such activities are conducted or sponsored by any of the offices or organizations enumerated in DR 2–103(D)(1) through (4), to the extent and under the conditions prescribed therein.

(3) A lawyer who is recommended, furnished or paid by a qualified legal assistance organization enumerated in DR 2–103(D)(1) through (4) may represent a member or beneficiary thereof, to the extent and under the conditions prescribed therein.

(4) Without affecting his right to accept employment, a lawyer may speak publicly or write for publication on legal topics so long as he does not emphasize his own professional experience or reputation and does not undertake to give individual advice.

(5) If success in asserting rights or defenses of his client in litigation in the nature of a class action is dependent upon the joinder of others, a lawyer may accept, but shall not seek, employment from those contacted for the purpose of obtaining their joinder. [Court Order, February 28, 1977; February 17, 1978]

**DR 2–105 Description and Limitation of Practice.**

(A) A lawyer may hold himself out publicly as practicing in or limiting his practice to certain fields of law as follows:

(1) A lawyer admitted to practice before the United States Patent and Trademark Office may use the designation "Patents", "Patent Attorney", "Patent Lawyer", or "Registered Patent Attorney" or any combination of those terms, on his professional card, letterhead, office sign, professional notice or announcement, and tele-

phone directory listings, all as otherwise allowed by DR 2–102(A), and in newspapers, periodicals and legal directories, as otherwise allowed by DR 2–101(B). In addition to use of the designation "Patents", "Patent Attorney", "Patent Lawyer", and "Registered Patent Attorney", a lawyer admitted to practice before the United States Patent and Trademark Office may use the designation "Trademarks", "Trademarks and Copyright Matters", "Trademark Attorney", "Trademark Lawyer", or any combination of those terms on his professional card, letterhead, office sign, professional notice or announcement and telephone directory listing, all as otherwise allowed by DR 2–102(A), and in newspapers, periodicals and legal directories as otherwise allowed by DR 2–101(B), provided the lawyer satisfies the eligibility requirements of DR 2–105(A)(4) in any one of the fields of practice of "Patents, Trademarks or Copyright Matters" or combination thereof.

(2) An individual lawyer who, in fact, limits his practice to certain fields of law or who is limiting his practice primarily to certain fields of law, and who satisfies the eligibility requirements of DR 2–105(A)(4), may indicate such limitation or description of his practice by listing, in the manner provided by DR 2–105(A)(3), not more than three of the following fields of law practice on his professional card, letterhead, professional announcement, and the classified section of the telephone directory, all as otherwise allowed by DR 2–102(A), and in newspapers, periodicals and legal directories, as otherwise allowed by DR 2–101(B):

Administrative Agency Matters
Admiralty
Antitrust and Trade Regulation
Appellate Practice
Banking and Creditor Law
Constitutional Law
Consumer Claims and Protection
Corporate Finance and Securities Law
Corporation and Business Law
Criminal Law
Debt and Bankruptcy Matters
Domestic Relations and Family Law
Environmental Law
Health Law
Immigration and Customs
Insurance
International and Foreign Law
Job Discrimination and Civil Rights
Labor Law
Legislative Matters
Military Law
Municipal and Local Government Law and Finance
Pension, Profit Sharing and Employee Benefit Plans
Personal Injury and Property Damage Claims
Public Utility Matters
Real Estate Law
Taxation Law
Trademarks and Copyright Matters
Transportation Law
Trial Practice
Wills, Estate Planning and Probate Matters
Workers Compensation

The committee on professional ethics and conduct of the Iowa State Bar Association, acting as commissioners of the supreme court as provided by court rule 118, on its own motion or upon the request of a lawyer admitted to practice in this state, shall, from time to time, consider and recommend to the court proposed amendments to the Code expanding or restricting the permitted list of fields of law practice.

(3) Description or indication of limitation of practice permitted by DR 2–105(A)(2) shall be only in the following manner:

(a) If the lawyer accepts only legal matters in his listed fields of law practice, such listing of fields of law practice shall be preceded by the words "Practice limited to . . ."; or

(b) If the lawyer is practicing primarily in his listed fields of law practice but he also accepts other types of legal matters, such listing of fields of law practice shall be preceded by the words "Practicing primarily in . . .";

and shall, in the case of a description or indication of limitation of practice communicated to the public in the classified section of telephone directories, or in newspapers, periodicals and legal directories, contain within such communication, or have prominently displayed on the same page of such communication, a "Notice to Public" in the following form:

(c) "A description or indication of limitation of practice does not mean that any agency or board has certified such lawyer as a specialist or expert in an indicated field of law practice nor does it mean that such lawyer is necessarily any more expert or competent than any other lawyer. All potential clients are urged to make their own independent investigation and evaluation of any lawyer being considered. This notice is required by rule of the Supreme Court of Iowa."

In the case of a description or indication of limitation of practice communicated to the public in the classified section of telephone directories, a lawyer shall not permit his name to be listed under a heading or classification other than "Attorneys" or "Lawyers".

(4) Prior to communication of a description or indication of limitation of practice permitted by DR 2–105(A)(2), a lawyer shall report his compliance with the following eligibility requirements each year in the written report required to be submitted to the Commission on Continuing Legal Education:

(a) The lawyer must have devoted the greater of 200 hours or twenty percent of his time spent in actual law practice to each separate indicated field of practice for each of the last two calendar years; and

(b) The lawyer must have completed at least ten hours of accredited Continuing Legal Education courses of study in each separate indicated field of practice during the preceding calendar year. The first report of compliance may be made in 1979. In reporting compliance with subsection (a), a statement¹ of compliance is sufficient. In reporting compliance with subsection (b), the lawyer shall identify the specific courses and hours which apply to each indicated field of practice. Contents of the portion of the report required by this rule shall be public information.

Referred to in Definitions

(B) A lawyer may communicate the name of state and federal courts in which he or she is currently permitted to practice on his professional card, letterhead, office sign, professional notice or announcement, and telephone directory listings, all as otherwise allowed by DR 2–102(A), and in newspapers, periodicals and legal directories, as otherwise allowed by DR 2–101(B).

If, due to hardship or extenuating circumstances, a lawyer is unable to complete the hours of accredited continuing legal education during the preceding calendar year as required by DR 2–105(A)(4)(b), the lawyer may apply to the Commission on Continuing Legal Education for an extension of time in which to complete the hours. No extension of time shall be granted unless written application therefor shall be made on forms prescribed by the commission. Extensions of time within which to fulfill the minimum educational requirements may, in individual cases involving hardship or extenuating circumstances, be granted by the commission for a period not to exceed six months immediately following expiration of the year in which the requirements were not met. [Court Order February 17, 1978; October 11, 1978; March 5, 1979; May 29, 1979; December 31, 1979]

Referred to in DR 2–101, DR 2–102, EC 2–16

Referred to in Professional Ethics and Conduct rules 5.1, 5.6

Referred to in "Definitions"